AFFIRM; Opinion issued October 30, 2012



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

No. 05-11-00362-CR
No. 05-11-00363-CR

**MARCUS JAMERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194ᵗʰ Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F10-14439-M & F10-14440-M**

# OPINION

Before Justices Morris, Moseley, and Myers
Opinion By Justice Morris

At trial, Marcus Jamerson was convicted of two aggravated robberies. In his sole point of

error on appeal, he complains the trial court erred in permitting a forensic biologist to testify about

a DNA report she reviewed for the non-testifying biologist who prepared it. Concluding the trial

court did not abuse its discretion in allowing the testimony, we affirm the trial court's judgments.

I.

Over a period of several hours, a man robbed a woman and her mother at the apartment the

two women shared. He cut the telephone lines in the apartment and disabled the women's cell

phones. He hinted at sexually assaulting the daughter, bound both women with duct tape, and

blindfolded them. He left the apartment in the mother's car with many of the women's possessions.

The car was found abandoned at a car wash later that day. Inside it, police found a cigarette butt and a gardening glove. Neither the mother nor the daughter smoked. The daughter stated that the robber had asked if there were any gloves in the apartment and she had told him where to find a pair of gardening gloves. Later, the daughter, though blindfolded, could tell from the robber's touching her that he was using the gloves.

The two complainants were unable to identify the man who robbed them, although the daughter was able to give police enough information to generate a computer sketch of the perpetrator. The sketch was admitted into evidence. She described the robber at trial as a slim, light-skinned black man who appeared to be approximately thirty to forty years old. The robber had awakened her from sleep, so she did not have her contact lenses in during the robbery, and she admitted she had only seen his face for about forty-five seconds. The mother, who had been forced to the ground and then blindfolded as soon as she entered the apartment after returning home from work, had not seen the robber's face at all. She described him as dark-skinned black man with a slim build. She told police after the robberies that she would not be able to identify the man in the future.

Several years after the robberies, a prison inmate contacted authorities about identifying appellant as the perpetrator of a crime. The former inmate testified at trial that, while he and appellant had been confined together, appellant boasted to him that he had committed a serious offense for which he had not been caught. The inmate then related a series of details about the robberies including the location of the apartment, the daughter's approximate age, the mother's profession, and the type of car appellant stole. The former inmate testified that he did not know the two complainants and had not heard anything about the robberies before appellant told him what he had done. He testified that he had not been promised anything for his testimony and had thought the

information he had given would remain anonymous. Police testimony, however, showed that the former inmate had actually considered not testifying because he had thought he had turned the information in as a Crime Stoppers tip and was upset he was not being compensated.

Upon learning that appellant had admitted his guilt for the robberies to his fellow inmate, police obtained a sample of appellant's DNA to compare to the DNA that had already been gathered from the cigarette butt and glove. The DNA analyst who had performed the testing was living outside the United States at the time of trial, but her "technical reviewer," who had overseen the testing and checked the results, testified at trial. The reviewer, Angela Fitzwater, testified that appellant was conclusively linked to DNA found on the cigarette butt and on the outside of the gardening glove. At the request of the defense, the trial court admitted the DNA report into evidence.[1] On cross-examination, Fitzwater admitted that she and her supervisor had missed some errors made in the report. The errors, however, did not decisively change the results of the DNA links to appellant.

## II.

In his sole point of error, appellant complains the trial court should not have permitted Fitzwater to testify about the DNA testing because such testimony amounted to a violation of his rights under the Confrontation Clause. The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides that in all criminal prosecutions, the accused shall enjoy the right to confront the witnesses against him. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the

---

[1] There were actually two reports containing all the DNA evidence relevant to the robberies. Both reports were admitted into evidence at the request of appellant.

declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine him. *Id.* at 68. We review a trial court's decision to admit complained-of evidence under an abuse of discretion standard. *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

Here, outside the presence of the jury, Fitzwater testified that she was the "technical reviewer" of the original forensic biologist assigned to the case, Tara Johnson. After Johnson performed the DNA testing and wrote up a draft report, Fitzwater reviewed Johnson's data work, reviewed the report, and signed off on it as a technical reviewer before it went through an additional supervisory review. She confirmed that she went through "step by step every single thing that Tara Johnson did, every single part of that testing and reviewed it and the information that was generated as a part of that investigation and laboratory work." She acknowledged that she was not with Johnson at the time she did her testing, but she reviewed all of Johnson's notes and all the data that she generated after her testing. Fitzwater testified that she did not prepare a separate report or interpret the work independently but rather reviewed Johnson's interpretation of the data in her preliminary report. Clarifying her testimony, Fitzwater said, "When I see that [Johnson had] interpreted her data, I would myself as a technical reviewer, interpret the data. And in this case, I did agree with her interpretation; and therefore, I was able to sign off on her as technical reviewer."

Fitzwater testified that in addition to being technical reviewer of Johnson's reports, she was also a custodian of the records of the reports that Johnson prepared in the normal course of business for the Southwest Institute of Forensic Sciences. Fitzwater further explained that SWIFS uses technical reviewers in part so that a reviewer may testify in place of the original analyst if the original analyst leaves the laboratory and is unable to testify in a case.

During her testimony before the jury, Fitzwater elaborated,

> [T]here are three different steps in the DNA testing process. There is the

initial DNA extraction of the samples of the strain, DNA extracted from that particular sample. The cells are very seldom to be released in DNA. The DNA is cleaned and purified. It is quantitated to see how much is there. It is then amplified, this means that the DNA strains are copied over and over. In order to be able to detect this DNA by our instrument . . . it is an aid to help us visualize the DNA profile. In each of these steps, the DNA analyst will document on worksheets the times that these different processes are started, what samples were tested, how much of the samples were tested, how long they were incubated and those types of steps. I will then review each one of these worksheets and what processes she went through. I will also review what is called an electropherogram, which is a computer generated printout of a visualization of the DNA profile. And I will review her interpretation of these DNA profiles. And the . . . DNA packets contained all of these documentation [sic] and I go through each page and review each page.

Fitzwater again confirmed that she made her own interpretation of the raw data in determining whether Johnson's interpretation was correct.

Fitzwater testified that she did not know appellant but knew some information about the robberies based on documentation the biologists had received from detectives or on submission forms. She further testified that there was no pressure on the forensic biologists to link appellant to the offenses. Fitzwater stated that early testing of the cigarette butt and glove showed only an unknown male DNA profile. When they later received appellant's DNA swab, they were then able to compare and match appellant to the unknown male DNA.

Appellant argues that, under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and its progeny, the trial court violated his right to confront the witnesses against him because Fitzwater was allowed to testify about the contents of the DNA report despite the fact that she was not the analyst who had done the actual testing. Appellant does not complain that Fitzwater was unable to testify about her analysis of the raw data but rather that Fitzwater did nothing but parrot Johnson's findings and conclusions. He contends that Fitzwater was acting as a "conduit" expert for what was actually Johnson's opinion. *See Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2716 (2011) (holding use of "surrogate" expert to introduce blood-alcohol report prepared by another analyst violated

Confrontation Clause). We disagree.

In this case, Fitzwater, as the technical reviewer assigned to the case, was familiar with each step of the complex testing process and performed her own analysis of the data to compare with Johnson's to confirm that Johnson's analysis was correct. *Cf. id.* at 2722 (Sotomayor, J., concurring) (specifying that inadmissible report in the case had not been admitted through "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue"). She personally reviewed the data used in each phase of Johnson's work. She was able to describe the precise process of the testing because she was familiar with the protocols used in her laboratory. Her testimony was an explanation of her work in the case, rather than an after-the-fact explanation of Johnson's work. Moreover, neither she nor Johnson had any way of knowing whether the DNA testing in the case would incriminate or exonerate appellant. *See Williams v. Illinois*, 132 S. Ct. 2221, 2244 (2012).

To the extent Fitzwater made errors in her review, appellant was able to — and did — point out those errors during cross-examination. To the extent Fitzwater did not prepare a separate report based on her assessment of the data, appellant was able to cross-examine her on that matter as well. Fitzwater did not act as a conduit for Johnson's conclusions but rather testified about what she observed and concluded in reviewing the data Johnson's work produced. *Cf. Hall v. State*, Nos. 05-10-00084-CR, 05-10-00085-CR, 05-10-00086-CR, 05-10-00087-CR, 2012 WL 3174130, at *8 (Tex. App.—Dallas Aug. 7, 2012, pet. ref'd) (not designated for publication) (concluding admission of lab report and testimony about the report by SWIFS supervisor who failed to testify about any independent judgments she may have formed and instead merely adopted findings of analyst who tested the drugs and prepared the report violated Confrontation Clause).

Of course, cross-examination of Fitzwater may not have addressed every risk of bias or error

in the forensic testing. Admittedly, all stages of DNA testing may be susceptible to error and falsification, so a defendant must be given a reasonable opportunity to reveal any such errors or falsifications through cross-examination. *State v. Lopez*, 45 A.3d 1, 16 (R.I. 2012) (citing *Melendez-Diaz*, 557 U.S. at 318). The opportunity, however, is not boundless. The Confrontation Clause does not mandate "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez-Diaz*, 557 U.S. at 311 n.1.

The United States Supreme Court recently held that, under the right circumstances, a trial court does not violate the Confrontation Clause by admitting a DNA report into evidence based on the testimony of an independent DNA expert with no connection to the testing laboratory or knowledge of its procedures and who did not take part in the testing or the formulation of the report. *See Williams*, 132 S. Ct. at 2244. The Supreme Court noted, "[G]iven the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise makeup of [the defendant]. The prospect is beyond fanciful." *Id.* Here, it was the defense who requested the trial court to admit the report into evidence.

At the time the State offered Fitzwater's testimony, the report was not admitted into evidence. Appellant, however, had ample opportunity to confront Fitzwater about the complex process used in the DNA testing, the data gathered, and the analysis she personally performed to evaluate Johnson's analysis. Accordingly, his rights under the Confrontation Clause were satisfied in this case. *See Lopez*, 45 A.3d at 16; *see also State v. McMillan*, 718 S.E.2d 640, 647 (N.C. Ct. App. 2011) (holding testimony by forensic pathologist regarding autopsy of victim did not violate Confrontation Clause because pathologist had been present for autopsy and testified about her own independent conclusions, though report was written by another doctor). We conclude that the trial

–7–

court did not abuse its discretion in permitting Fitzwater's testimony.

We overrule appellant's sole point of error and affirm the trial court's judgments.

JOSEPH B. MORRIS
JUSTICE

Publish
TEX. R. APP. P. 47
110362F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MARCUS JAMERSON, Appellant

No. 05-11-00362-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 194th Judicial District Court of Dallas County, Texas. (Tr.Ct.No. F10-14439-M).
Opinion delivered by Justice Morris,
Justices Moseley and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 30, 2012.

JOSEPH B. MORRIS
JUSTICE



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARCUS JAMERSON, Appellant

No. 05-11-00363-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 194th Judicial District Court of Dallas County, Texas. (Tr.Ct.No. F10-14440-M).
Opinion delivered by Justice Morris, Justices Moseley and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 30, 2012.

JOSEPH B. MORRIS
JUSTICE