2013 CO 51

**Dina MARSHALL, Petitioner,**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 11SC596**

Supreme Court of Colorado,
En Banc.

July 1, 2013

Rehearing Denied Sept. 9, 2013 *

Attorneys for Petitioner: Collins, Liu & Associates, L.L.P., Jacob Lofgren, Greeley, Colorado.

Attorneys for Respondent:Don Quick, District Attorney, 17th Judicial District, Michael J. Milne, Sr. Deputy District Attorney, Brighton, Colorado.

Justice EID delivered the Opinion of the Court.

¶1 The People charged the Petitioner, Dina Marshall, with driving under the influence of drugs, careless driving, and possession of drug paraphernalia after lab urinalysis results revealed Marshall had methamphetamine in her system when she caused a car accident. At trial, the People

* Chief Justice Bender and Justice Boatright would    grant the Petition.

called Cynthia Burbach, the supervisor of the Colorado Department of Health toxicology lab, to testify about Marshall's level of intoxication. During Burbach's testimony, the People sought to admit the lab result showing that Marshall had methamphetamine present in her urine. Over Marshall's objection, the county court admitted the lab report without the testimony of the lab technician who actually performed the test. The county court also denied Marshall's motion for judgment of acquittal on the paraphernalia possession charge. Acting in its appellate capacity, the district court upheld both of the trial court's decisions. Marshall petitioned this court for a writ of certiorari, which we granted.

¶ 2 We now affirm the district court's ruling regarding the admission of the lab report. First, we find that admission of the lab report did not violate the Confrontation Clause. While Burbach did not conduct the test of Marshall's urine sample herself, she supervised the testing process, reviewed all the data generated by the test, made the determination that the data accurately determined that Marshall had methamphetamine present in her urine, and certified the test results. She therefore did not provide "surrogate" testimony of the sort found to be problematic in *Bullcoming v. New Mexico*, — U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).

¶ 3 Second, admission of the lab report did not violate section 16–3–309(5), C.R.S. (2012). That section provides that, upon a defendant's timely request, the lab employee who "accomplished the requested analysis" must be made available to testify at trial. According to the plain meaning of "accomplish," Burbach accomplished the analysis because she performed the final analysis of the data required to certify the results. as accurate. Therefore, Burbach's testimony satisfied section 16–3–309(5).

¶ 4 Finally, the People concede, and our review confirms, that there was no evidence presented that Marshall possessed drug paraphernalia. Therefore, we find that the county court erroneously denied Marshall's motion for judgment of acquittal on this

charge, and reverse the district court's judgment in this regard.

## I.

¶ 5 Dina Marshall was driving her truck on March 4, 2008, in Thornton when she rear-ended another woman's vehicle. The two women pulled into a gas station parking lot to exchange information. After pulling into the parking lot, Marshall backed into the woman's car, and the woman called Thornton police.

¶ 6 Officer Mark Swisher arrived on the scene and began asking Marshall what happened. Marshall talked rapidly, jumped from subject to subject, hesitated during the middle of sentences, was unsteady while standing and walking, and could not hold still while speaking with him. Based on this conduct, Officer Swisher began to suspect that Marshall was under the influence of drugs. Officer Swisher asked Marshall if she would be willing to complete voluntary roadside maneuvers, and Marshall responded, "I don't want to but I will." After Marshall failed all three roadside maneuvers, Officer Swisher advised her of her *Miranda* rights and arrested her. When Officer Swisher asked Marshall whether she was under the influence of prescription or illegal drugs, Marshall responded, "You already know I smoked meth two hours ago." Officer Swisher administered a breath test to rule out the presence of alcohol. When he informed Marshall that she had passed the breath test, she responded that she already told him she had not been drinking but had smoked meth. Marshall then consented to a urine test to screen for the presence of drugs.

¶ 7 The Thornton Police Department sent Marshall's urine sample to the Colorado Department of Health toxicology lab and requested that the sample be tested for the presence of amphetamines. When the lab receives a sample, protocol dictates that the receiving analyst sign for the sample and note whether the seal appears intact. Then the sample is assigned a toxicology number. A lab analyst first performs a screening test on the sample to determine whether amphetamines might be present in the urine. If this screening test produces a presumptive posi-

tive result for amphetamines, another analyst will perform a confirmation test on a gas chromatograph/mass spectrometer. This confirmation test specifically tests for methamphetamine and can more accurately predict its presence in the sample. The confirmation analyst formats the results generated by the instrument into an Excel spreadsheet, and then the results go through a peer review before they are reviewed by a work leader. Finally, the file containing this information is given to the lab supervisor, Burbach, to be approved.

¶ 8 According to Burbach's testimony, she conducts several steps of review of the instrument data. First, she determines whether the controls fall within their expected range. Second, she considers the calibration samples to ensure that they met quality control standards. Third, she determines whether all the ions necessary to conclude that methamphetamine existed in the urine are present in the urine sample. Fourth, she analyzes the internal standard to determine whether it worked in each sample. Finally, she looks to make sure the two lab technicians have not taken any corrective actions during the test. Once Burbach has completed her review, she can certify the results and send them back to the requesting police department.

¶ 9 In this case, Burbach certified results showing that Marshall's urine tested positive for the presence of methamphetamine by signing the results form. No other person's name appears on the form. During her testimony, Burbach acknowledged that she did not perform any of the tests on the sample. The form Burbach signed stated that only the confirmation test should be used for "legal purposes."

¶ 10 The People charged Marshall with driving under the influence of drugs[1] and careless driving,[2] both misdemeanors. When defense counsel received the litigation packet, she realized that the People sought to introduce the urinalysis results. Counsel filed a timely motion, pursuant to section 16–3–309(5), requesting that the People make the lab technician who performed the urinalysis testing available to testify at Marshall's trial. The People called Burbach to testify at the trial, and defense counsel objected on the ground that Marshall had a right to confront the lab technician who actually performed the test. The county court overruled the objection.

¶ 11 Defense counsel also objected when the People sought to admit People's Exhibits 1 and 2 through the testimony of Burbach. Exhibit 1, which was signed by Officer Swisher and initialed by an unidentified lab employee, provided the chain of custody for the sample. Exhibit 2, which was signed by Burbach, provided the urinalysis results. The county court admitted both exhibits under the business records exception to the hearsay rule.

¶ 12 On October 15, 2010, the People also charged Marshall with possession of drug paraphernalia[3] based on the fact that police officers found a drug pipe in Marshall's truck when they conducted an inventory search after her arrest. Both the People and defense counsel discussed the pipe during opening arguments. However, the People failed to introduce any evidence of the drug pipe. As a result, defense counsel made a motion for judgment of acquittal at the close of the People's case. The county court denied the motion.

¶ 13 The jury convicted Marshall of all three offenses. Marshall appealed her convictions to the district court, and the district court affirmed. She then petitioned this court for certiorari. We granted certiorari to consider whether either the Confrontation Clause or section 16–3–309(5), precluded the People from introducing the report showing Marshall's urinalysis results when Burbach, but not the lab technician, testified at trial, and also to consider whether the trial court erred in denying the motion for judgment of acquittal on the possession of drug paraphernalia charge.[4]

1. § 42–4–1301(1)(a), C.R.S. (2012).

2. § 42–4–1402, C.R.S. (2012).

3. § 18–18–428(1), C.R.S. (2012).

4. Specifically, we granted certiorari to consider the following issues:
   1. Whether, in light of the United StatesSupreme Court's recent decision in *Bullcom-*

¶ 14 We now affirm the district court's judgment that the admission of the lab report certified by Burbach did not violate the Confrontation Clause or section 16–3–309(5). We reverse the judgment of the district court as to the drug paraphernalia charge, and remand the case for proceedings consistent with this opinion.

## II.

¶ 15 The Sixth Amendment of the United States Constitution affords to the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Colo. Const. art. II, § 16 ("In criminal prosecutions the accused shall have the right ... to meet the witnesses against him face to face...."); *Hinojos–Mendoza v. People,* 169 P.3d 662, 665 (Colo.2007) (noting that "[t]he Sixth Amendment right to confrontation applies to state as well as federal prosecutions"). The United States Supreme Court has interpreted this right to disallow "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The People appear to concede, and we agree, that the report in this case was testimonial in nature. *See Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2717 (holding that a lab report was sufficiently formalized to qualify as testimonial when it was in a signed document labeled as a report and acknowledged court rules governing its admissibility); *Hinojos–Mendoza,* 169 P.3d at 667 (finding a lab report to be testimonial when "the sole purpose of the report was to analyze the

substance found in [defendant's] vehicle in anticipation of criminal prosecution"). We therefore turn to the question whether Burbach's testimony satisfied the dictates of the Confrontation Clause.[5]

¶ 16 Marshall argues that Burbach's testimony ran afoul of the Supreme Court's recent decision in *Bullcoming.* We disagree.

¶ 17 In *Bullcoming,* the state introduced as evidence against the defendant test results certified by a particular lab analyst. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2709. However, the state did not call as a witness the analyst who certified the results, but rather called another analyst who would serve as a "surrogate." *Id.* at ——, 131 S.Ct. at 2713. The New Mexico Supreme Court held that such surrogate testimony met the dictates of the Confrontation Clause. *Id.* The Supreme Court reversed, explaining that testimony of a surrogate—that is, a person "who did not sign the certification or personally perform or observe the performance of the test reported in the certification," *id.* at ——, 131 S.Ct. at 2713—"could not convey what [the non-testifying analyst] knew or observed about the events his certification concerned." *Id.* at ——, 131 S.Ct. at 2715; *see also id.* at ——, 131 S.Ct. at 2722 (Sotomayor, J., concurring in part) (noting that the "court below ... recognized [the testifying witness's] total lack of connection to the test at issue"). As the Court concluded, "when the State elected to introduce [the lab analyst's] certification, [that analyst] became a witness [the defendant] had the right to confront." *Id.* at ——, 131 S.Ct. at 2716. Because the defendant was not given an opportunity to confront the analyst, the Court

---

ing v. New Mexico, —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the appearance of a lab supervisor that reviewed and approved test results completed by another technician is sufficient to satisfy the Confrontation Clause of the United States Constitution.

2. Whether the appearance of a lab supervisor that reviewed and approved test results completed by another technician is sufficient to satisfy section 16–3–309(5), C.R.S. (2011).

3. Whether the denial of a motion for judgment of acquittal was in error where no evidence was presented in support of the

charge of possession of drug paraphernalia.

5. The People argue that because Marshall's objection at trial was phrased only in terms of a violation of section 16–3–309(5), and not the Confrontation Clause, her Confrontation Clause claim should be reviewed only for plain error. We need not decide what sort of objection would be required to preserve a Confrontation Clause challenge because, assuming for the purposes of this case that Marshall's objection was sufficient to preserve such a challenge, we find that there was no confrontation error in this case.

found that the Confrontation Clause was violated. *Id.* at ——, 131 S.Ct. at 2710.

¶ 18 We find that Burbach did not provide "surrogate" testimony of the sort that the Court found problematic in *Bullcoming.* Unlike in *Bullcoming*, where the testifying witness had no connection with the particular lab report at issue, here Burbach supervised the performance of the tests and certified the lab report. According to Burbach's testimony, she synthesized the tests performed by two different analysts to ensure that both had reached the same conclusion. Then, she reviewed the data generated by the scientific instruments to ensure that the controls show the instruments were working properly while they performed the tests in question. Finally, she reviewed the analysts' notes to conclude that they followed lab protocol throughout the testing process. Only after she performed all of these steps did she certify the test results and sign the form that was sent back to the Thornton Police Department.[6] In other words, when Burbach testified at trial, she testified as to her own involvement in the process, not as a "surrogate" for someone else's.

¶ 19 Other courts that have considered this question have found that supervisor testimony satisfies the Confrontation Clause when the supervisor prepares or signs the report. *See, e.g., United States v. Summers*, 666 F.3d

192 (4th Cir.2011) (finding the Confrontation Clause satisfied through the testimony of a supervisor who had prepared and signed a DNA test report based on data generated by another analyst but conclusions drawn by the supervisor); *Jenkins v. State*, 102 So.3d 1063 (Miss.2012) (finding no Confrontation Clause violation when a supervisor did not perform the actual test but reviewed the data generated, reached his own conclusion, and signed the report as a supervisor); *Commonwealth v. Yohe*, 39 A.3d 381 (Pa.Super.Ct.2012) (allowing a lab supervisor to introduce a blood alcohol test when he did not perform the test but reviewed the results, certified their accuracy, and signed the report); *State v. Lopez*, 45 A.3d 1 (R.I.2012) (allowing a lab supervisor to introduce DNA results when he did not perform the tests but evaluated all the results, drew conclusions based on those results, and prepared the report).[7] We join these courts in concluding that when a lab supervisor such as Burbach independently reviews scientific data, draws the conclusion that the data indicates the positive presence of methamphetamine, and signs a report to that effect that is admitted at trial, the Confrontation Clause is satisfied if she testifies and is available for cross-examination.[8]

¶ 20 Under *Bullcoming*, once the lab report certified by Burbach was introduced as evidence against Marshall, she became "a

6.  People's Exhibit 1, the lab services requisition form, contains a signature from someone other than Burbach acknowledging that the lab received Marshall's urine sample and that the seal did not appear broken. Marshall does not raise a confrontation challenge to this form, and therefore we do not address it.

7.  As would be expected in labs with different procedures, factual circumstances surrounding supervisors' method of reviewing and certifying lab results can vary. *See, e.g., Summers*, 666 F.3d at 196 (supervisor wrote a separate report and created a table comparing DNA results); *Lopez*, 45 A.3d at 11 (supervisor prepared a report based on a comparison of DNA profiles). Here, Burbach independently reviewed the scientific data and certified the urinalysis report as accurate. These minor distinctions do not change the fact that these supervisors independently reviewed and certified lab results, and thus do not affect our analysis.

8.  We find other decisions to be unpersuasive because they either declined to resolve the issue, found any error to be harmless, or are factually

distinguishable. In *United States v. Moore*, 651 F.3d 30, 71–72 (D.C.Cir.2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 2772, 183 L.Ed.2d 642 (2012), for example, the court expressly declined to resolve the Confrontation Clause issue where the supervisor in question, in contrast to the facts here, did not sign any of the twenty DEA reports about which he testified, and the record offered no proof that he certified any of them; further, the court found any error would be harmless. Similarly, in *Sherrill v. Thaler*, H–11–0388, 2012 WL 718942 (S.D.Tex. Mar. 5, 2012), the court found "[a]rguabl[e]" error where testifying lab supervisor did not generate the final report at issue, in contrast to the facts here, but concluded any error to be harmless. *See also People v. Morrison*, 90 A.D.3d 1554, 935 N.Y.S.2d 234 (2011) (same). Finally, we simply disagree with the court's reasoning in *Martin v. State*, 60 A.3d 1100 (Del.2013), that *Bullcoming* requires that a defendant have the opportunity to confront any lab analyst who participates in the testing process.

witness [the defendant] had the right to confront." —— U.S. at ——, 131 S.Ct. at 2716; *see also id.* at ——, 131 S.Ct. at 2710 ("The accused's right is to be confronted with the analyst who made the certification...."). Marshall did in fact confront Burbach at trial, subjecting her to thorough cross-examination.[9] Accordingly, we conclude that no violation of the Confrontation Clause occurred in this case.

## III.

■ We also disagree with Marshall's argument that the People violated section 16–3–309(5) by calling Burbach, rather than the analyst who performed the confirmation test, to testify at Marshall's trial. Section 16–3–309(5) provides as follows:

> Any report or copy thereof or the findings of the criminalistics laboratory shall be received in evidence in any court, preliminary hearing, or grand jury proceeding in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory *who accomplished the requested analysis, comparison, or identification* had testified in person. *Any party may request that such employee or technician testify in person at a criminal* trial on behalf of the state before a jury or to the court, by notifying the witness and other party at least fourteen days before the date of such criminal trial.

(Emphasis added). As relevant here, the statute requires that the employee or analyst "who accomplished the requested analysis" be present to testify if the defendant comports with the other requirements of the statute. *See Cropper v. People*, 251 P.3d 434, 438 (Colo.2011) (a defendant may "avail [herself] of the opportunity to assert ... [her] confrontation rights" by following the dictates of section 16–3–309(5)). Therefore, in order to determine whether there was compliance with section 16–3–309(5) in this case, we must determine whether Burbach "accomplished" the requested urinalysis.

¶ 21 Because the legislature has not defined "accomplish" in the statute, we look to the plain meaning of the word. "Accomplish" means "to execute fully: perform, achieve, fulfill." *Webster's Third New International Dictionary* 12 (2002). For many of the same reasons discussed in the previous section, Burbach "accomplished" the requested urinalysis.

¶ 22 Although two other analysts performed the screening and confirmation tests, Burbach's expertise was required to generate the final report. Burbach reviewed both the screening and confirmation tests to ensure that their results coincided, analyzed the instrument data to verify that the instrument was working properly in each instance and that the results indicated the positive presence of methamphetamine, and reviewed the notes of the lab analysts to determine that the analysts had followed what Burbach considered to be acceptable lab protocol. Burbach's review and independent analysis was necessary to fully execute the requested urinalysis, because without this review, the results would not have been certified as accurate and mailed to the police department. Therefore, even though other analysts contributed to the ultimate result, Burbach performed the final and necessary step before the results could be certified as accurate. As a result, she "accomplished" the urinalysis that she signed and returned to the Thornton Police Department.[10]

¶ 23 In sum, we conclude that because Burbach accomplished the requested urinalysis, her testimony was sufficient to satisfy section 16–3–309(5).

---

9. Burbach's tenure as supervisor has been the subject of some controversy. However, as noted above, Marshall had the opportunity to confront Burbach and did in fact subject her to thorough cross-examination. At issue here is not the content of Marshall's cross-examination, but rather whether the Confrontation Clause is satisfied where the testifying lab supervisor independently reviews scientific data, draws the conclusion that the data indicates the positive presence of a substance, and signs a report to that effect. We hold that it is.

10. In this case, we are only asked to consider whether Burbach "accomplished" the urinalysis, and conclude that she did. We express no opinion as to whether other analysts within the lab could accomplish the test within the meaning of section 16–3–309(5).

## IV.

¶ 24 The People concede that there was no evidence presented that Marshall possessed drug paraphernalia. A review of the record confirms that both parties discussed a drug pipe during opening statements but that the People introduced no evidence of the drug pipe. Therefore, we find that the county court erroneously denied Marshall's motion for judgment of acquittal on this charge, and reverse the district court's judgment in this regard.

## V.

¶ 25 For the reasons stated above, we affirm the district court's judgment that the admission of the lab report certified by Burbach did not violate the Confrontation Clause or section 16–3–309(5). We reverse the judgment of the district court as to the drug paraphernalia charge, and remand the case for proceedings consistent with this opinion.

Chief Justice BENDER concurs in part and dissents in part, and Justice BOATRIGHT joins in the concurrence in part and the dissent in part.

Chief Justice BENDER, concurring in part and dissenting in part.

¶ 26 The majority holds that the Confrontation Clause is not violated by the admission of a lab report, which is conceded to be testimonial evidence, through testimony of a supervisor who neither performed the laboratory analysis nor supervised its performance. Maj. op. ¶ 18. Reliance upon forensic evidence has increased in criminal cases and the need to retain the traditional right of cross-examination must nonetheless be preserved. This case is only one example of the importance of testimonial forensic reports such as the lab report here. In my view, admitting a testimonial report without allowing the accused to confront the technician who created that report violates the Confrontation Clause in light of the Supreme Court's decision in *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). I would hold that admission of the lab report through the testimony of the supervisor violated the defendant's right under the Confrontation Clause to confront the witnesses against her.

¶ 27 The supervisor's review in this case does not substitute for the testimony of a technician who received the defendant's sample, performed the testing, and observed the results. The supervisor here testified that she did not know which technicians performed the testing and could not tell from the form she reviewed who they were. She testified that she based her certification on her expectation that the technicians had followed laboratory procedures but had no way of knowing whether they actually did follow procedures. Her supervision thus consisted of reviewing machine-generated reports in large batches, assuming procedures had been followed if there were no notes on the reports and the data indicated the machines were working properly, and "rubber stamping" the reports. Although, unlike the analyst in *Bullcoming,* the supervisor's signature appeared on the reports as a certifier, she testified as to the contents of a lab report without actually screening or observing the screening of a blood sample. Her testimony raises the same constitutional concerns as the testimony of the *Bullcoming* analyst, who also testified about results without performing or observing the test that generated those results.

¶ 28 Although the Confrontation Clause issue is dispositive to this case, I address the statutory issue because the majority does. Section 16–3–309(5), C.R.S. (2012) requires the employee or technician who "accomplished" the analysis in a laboratory test be made available to testify. In my view, the person who "accomplishes" a laboratory test is a percipient witness—one who perceives the results through his or her senses. Because a supervisor who reviews reports and does not run the tests herself does not perceive the test results and does not accomplish the test under the statute, I would also hold that the trial court erred by not following the mandate of section 16–3–309(5), which requires a forensic lab percipient witness to testify and be subject to cross-examination by either party in a criminal case. To hold as the majority does places a higher value on the convenience of state laboratory employ-

ees over the protection of the accused's confrontation rights and undermines the purpose of this statute, which is to preserve these rights. Hence, I respectfully dissent from all but Part IV of the majority opinion.

## I.

¶ 29 Defendant Dina Marshall rear-ended another woman's car, then backed into the car again after pulling into a parking lot. An officer gave Marshall roadside sobriety tests, which she failed. She told the officer that she had been smoking methamphetamine. Marshall consented to a urine test and provided a sample, which the police sent to the Colorado Department of Health toxicology lab for screening.

¶ 30 The People notified defense counsel that they would introduce the results of Marshall's urinalysis. Marshall's defense counsel filed a motion under section 16–3–309(5) requesting that the technician who analyzed Marshall's urine sample testify in person. The People then notified defense counsel that they intended to call Cynthia Burbach, director of the toxicology lab. Burbach supervised the lab and signed off on all of the lab's final reports, but she did not test samples herself.

¶ 31 At trial, Marshall objected to Burbach's proposed testimony because Burbach had not tested Marshall's sample herself, nor had she actually supervised the technician who did to make sure the technician followed proper procedures. Marshall requested that the technician who performed the analysis testify. The trial court overruled Marshall's objection and allowed Burbach to testify in lieu of the technician about the results of Marshall's urine sample.

¶ 32 Burbach testified about the process that each sample goes through before she reviews the reports. One technician receives the sample and performs an initial screening. A second technician then performs a more detailed test to determine more precisely what drug is in the sample and how much. The data is reviewed by two people before Burbach performs the final review. Reports for about a hundred different samples are compiled and sent to Burbach, who reviews them all in a batch as the final checkpoint before the reports are sent to the requesting police departments. This process takes her less than a day. She makes sure the tests match the calibrations and internal quality controls and checks to see whether either testing technician made any notes. If all appears to have gone according to procedure, then Burbach signs the reports before they are sent out. She does not observe the technicians while they perform the tests and does not perform any testing herself.

¶ 33 Burbach testified that she had not tested Marshall's sample and had not supervised the technicians who did. To determine whether Marshall's sample had been tested according to lab procedures, Burbach examined the printouts showing the results. These printouts did not show who had tested Marshall's sample or what had happened during the tests. Burbach did not know whether either of the technicians who tested Marshall's sample had run the sample more than once or had taken any other corrective measures. She testified: "I'm not standing over them on the day that they did it … I expect them to follow the standard operating procedure, but being over their shoulder, no."

## II.

¶ 34 Under the Sixth Amendment of the U.S. Constitution, the accused "shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Colo. Const. art. II, § 16 ("[T]he accused shall have the right … to meet the witnesses against him face to face."). The accused's right to confrontation is rooted in the common law tradition dating back to sixteenth-century England, "one of live testimony in court subject to adversarial testing." *Crawford v. Washington,* 541 U.S. 36, 43, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). This established tradition prevents the introduction in court of an out-of-court statement that is testimonial in nature, "made for the purpose of establishing or proving some fact," without allowing the accused to cross-examine the witness who made that statement. *Id.* at 51, 53–54, 124 S.Ct. 1354. A testimonial statement against an accused is thus inad-

missible unless the witness who made that statement appears at trial or, if the witness is unavailable, the defendant had a prior opportunity to cross-examine the witness. *Id.* at 53–54, 124 S.Ct. 1354. The results of a forensic analysis stating the composition of an analyzed substance are testimonial statements. *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 311, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). An accused is thus entitled to "be confronted with" the analyst who created such a report at trial. *Id.*[1]

¶ 35 In *Bullcoming,* the Supreme Court considered whether a "surrogate" analyst who does not "sign the certification or personally perform or observe the performance of the test reported in the certification" is a sufficient substitute. 131 S.Ct. at 2713. The prosecution presented evidence of the defendant's blood-alcohol level through the admission of a lab report. *Id.* at 2709. Instead of calling the technician who analyzed the defendant's blood sample as a witness, the prosecution called another technician who was familiar with the lab's procedures but who had neither tested the defendant's blood sample nor observed the testing. *Id.* The Court concluded that "surrogate testimony ... [cannot] convey what [the technician] knew or observed about ... the particular

test and testing process he employed." *Id.* at 2715.

¶ 36 Forensic evidence such as that featured in *Melendez–Diaz* and *Bullcoming* has "become an increasingly important and routinized aspect of our criminal justice system." Richard D. Friedman, *Confrontation and Forensic Laboratory Reports, Round Four,* 45 Tex. Tech L.Rev. 51, 53 (2012). "[C]riminal convictions often turn on scientific testing." Jesse J. Norris, *Who Can Testify About Lab Results After Melendez–Diaz and Bullcoming?: Surrogate Testimony and the Confrontation Clause,* 38 Am. J.Crim. L. 375, 377 (2011). However, the results of scientific testing, such as the urinalysis performed here, are "not uniquely immune from the risk of manipulation." *Melendez–Diaz,* 557 U.S. at 318, 129 S.Ct. 2527.[2] The Innocence Project at Cardozo University reports that invalidated or improper forensic science played a role in approximately half of the wrongful convictions later overturned based on DNA evidence.[3] In Colorado, the Attorney General's office recently issued a report detailing problems at the state toxicology lab.[4] The report describes technicians testing samples after only three weeks of training, blood samples kept in an unlocked refrigerator, and an unidentified supervisor[5] who was bi-

**1.** The People appear to concede, and the majority agrees, that the report in this case was testimonial. Maj. op. ¶ 15.

**2.** "[L]aboratory error and operator error exist even with the most well-established or unassailable scientific method." See Pamela R. Metzger, *Cheating the Constitution,* 59 Vand. L.Rev. 475, 494 (2006). A report by the National Academy of Sciences stated that forensic analyses are often handled by "poorly trained technicians" who might exaggerate the accuracy of their methods. Solomon Moore, *Science Found Wanting in Nation's Crime Labs,* N.Y. Times, Feb. 4, 2009, at http://www.nytimes.com/2009/02/05/us/05 forensics.html. Forensic science can also be discredited. As an example, comparative bullet-lead analysis was discredited by the National Academy of Sciences in 2004, in a study stating that decades of FBI court testimony linking a particular bullet to an accused's gun should be considered misleading. John Solomon, *FBI's ForensicTest Full of Holes,* Wash. Post, Nov. 18, 2007, http://www.washingtonpost.com/pdyn/content/article/2007/11/17/AR2007111701681.html.

**3.** Innocence Project, http://www.innocence project.org/Content/DNA_Exonerations_Nation-

wide.php (last visited June 26, 2013). Another study of 200 criminal exonerations found that faulty forensic evidence was the second leading type of evidence (after eyewitness identification) featured at trials that had resulted in wrongful convictions. Brandon L. Garrett, *Judging Innocence,* 108 Colum. L.Rev. 55, 59, 81 (2008). A different study of 137 exonerees' trial transcripts "found invalid forensic science testimony was not just common but prevalent." Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions,* 95 Va. L.Rev. 1, 14 (2009).

**4.** Investigation Report, Office of the Attorney General, Mar. 18, 2013, *available at* http://local tvkdvr.files.wordpress.com/2013/06/msec-letter-and-report.pdf.

**5.** News reports identified Burbach as the supervisor. She resigned her position as supervisor of the state toxicology lab shortly before the report was released to the state attorneys general. Eli Stokols, *Report: Former State Lab Supervisor Involved in Possible Cover–Up,* Fox 31 Denver (June 9, 2013, 7:01 p.m., updated June 10, 2013, 9:34 p.m.), http://kdvr.com/2013/ 06/09/report-

ased in favor of the prosecution, enjoyed testifying at trial, and bragged about making defense attorneys look like "idiots." As the U.S. Supreme Court noted, a forensic analyst responding to a request from law enforcement may have an incentive or feel pressure to provide a result favorable to the prosecution. *Melendez–Diaz*, 557 U.S. at 318, 129 S.Ct. 2527.

¶ 37 Given the increasing use of testimonial forensic evidence—and the possibility that such evidence could be analyzed incorrectly—it is important that courts maintain the historical right of an accused to cross-examine witnesses who present testimonial evidence. The problems reported at toxicology labs in general and the Colorado Department of Health toxicology lab in particular highlight the need to adhere to the traditional guarantee of confrontation. "[T]he analyst who provides false results may, under oath in open court, reconsider his false testimony." *Id.* at 319, 129 S.Ct. 2527. The cross-examination process will also help reveal an incompetent analyst in court by revealing an analyst's "lack of proper training or deficiency in judgment." *Id.* at 320, 129 S.Ct. 2527. Cross-examination gives the accused the opportunity to ask the analyst about the procedures the analyst used and what the analyst observed. It also gives the accused the chance to question the analyst's general knowledge and reliability.

¶ 38 A supervisor who signs off after reviewing data puts a "rubber stamp" on the report.[6] This is so because a supervisor does not perceive the result with his or her own senses. When a percipient witness testifies, that witness must testify to what he or she observed: what two commentators call "a combination of perception and memory." 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:6 (3d ed. 2007). A supervisor who did not perform the test or observe it being performed cannot testify as to whether procedures were followed with a particular sample or about what the analyst observed. Allowing a supervisor who did not conduct or observe forensic evidence analysis to testify "deprives ... the defendant of an opportunity to challenge the skill, qualifications, methodology and trustworthiness of the analyst, even though the validity of the underlying data wholly depends on the analyst." Norris, *Who Can Testify About Lab Results After Melendez–Diaz and Bullcoming*, 38 Am. J.Crim. L. at 401.

¶ 39 In this case, the majority concludes that Burbach was not a surrogate for the technician who analyzed Marshall's urine sample because she testified to her own involvement in the process and signed the report herself. Maj. op. ¶ 18. The majority reasons that Burbach's review of technicians' data reports and her signature on the final report provide a sufficient connection with the results of Marshall's urinalysis such that Burbach's testimony satisfies the requirements of the Confrontation Clause. *Id.* The majority cites cases from other courts that "have found that supervisor testimony satis-

former-state-crime-lab-supervisor-involved-in-possible-cover-up/; *see also* Tom McGhee & Joey Bunch, *Defense Lawyers Want Independent Probe of Colo. Toxicology Lab*, Denver Post, June 10, 2013, updated June 18, 2013, at http://www.denverpost.com/breakingnews/ci_/defenselawyers-want-independent-investigation-colo-toxicology-lab. The 2013 report was not the first report of problems in the lab Burbach supervised. The lab had to retest 1700 blood samples in 2012 after a blood sample was found to have higher blood-alcohol content than what the technician reported. Burbach was that technician's supervisor. Felisa Cardona, *Colorado Lab Director Says DUI Errors Aided Suspects, But 2 Restested Lower*, Denver Post, May 11, 2012, http://www.51fdenverpost.51fcom/news/ci_20597651/51fcolorado-lab-51fdirector-says-dui-errors-aided-suspects. In an incident involving another lab, Colorado Springs prosecutors either dismissed or reduced nine drinking and driving charges after 206 blood-test errors were discovered. John C. Ensslin, *Final Tally on Flawed DUI: 206 Errors, 9 Tossed or Reduced*, Colo. Springs Gazette, Apr. 19, 2010, http://gazette.com/article/97354.

6. *See* Norris, *Who Can Testify About Lab Results After Melendez–Diaz and Bullcoming?*, 38 Am. J.Crim. L. at 401; *see also* Pendergrass v. State, 913 N.E.2d 703, 711 (Ind.2009) (Rucker, J., dissenting). "[E]ven a laboratory supervisor might not be able to testify whether the laboratory procedures were followed if they did not watch their subordinate perform the entire test." Tara R. Price, Note, *"Bull" Coming from the States: Why the Supreme Court Should Use Williams v. Illinois to Close One of Bullcoming's Confrontation Clause Loopholes*, 39 Fla. St. U.L.Rev. 533, 553 (2012).

fies the Confrontation Clause when the supervisor prepares or signs the report," but two of these cases involve supervisors who took a much more active role than Burbach did here. *Id.* ¶ 19.[7] As the majority acknowledges, a separate line of cases holds that supervisor testimony does not substitute for the testimony of the technician who actually analyzed the evidence. The reasoning of this line is the better one in my view. *See United States v. Moore*, 651 F.3d 30, 71–72 (D.C.Cir.2011) (holding testimony of supervisor who reviewed reports but ran no tests potentially violated Confrontation Clause and remanding for trial court to make findings on whether the supervisor's testimony caused prejudicial error); *Sherrill v. Thaler*, H–11–0338, 2012 WL 718942 at \*13 (S.D.Tex. Mar. 5, 2012) (holding that supervisor could not testify as to DNA analysis in place of analyst on maternity leave who conducted the tests); *Martin v. State*, 60 A.3d 1100, 1109 (Del. 2013) (holding that admission of lab results through testimony of supervisor who reviewed batch results of blood samples but did not observe testing violated Confrontation Clause); *People v. Morrison*, 90 A.D.3d 1554, 935 N.Y.S.2d 234, 237 (2011) (holding that supervisor who reviewed reports to ensure that analysts followed proper procedure could not testify in place of actual analysts without violating the Confrontation Clause).

¶ 40 In my view, Burbach's review does not substitute for the testimony of a technician who received Marshall's sample, performed the testing, and observed the results. Burbach testified that she did not know which technicians performed the testing and could not tell from the form she reviewed who they were. She testified that she based her certification on her expectation that the technicians had followed laboratory procedures but had no way of knowing whether they actually did follow procedures. Her supervision thus consisted of reviewing machine-generated reports in large batches, assuming procedures had been followed if there were no notes on the reports and the data indicated the machines were working properly, and "rubber stamping" the reports. Although, unlike the analyst in *Bullcoming*, Burbach's signature appeared on the reports as a certifier, she testified as to the contents of a lab report without actually screening or observing the screening of a blood sample. Her testimony raises the same constitutional concerns as the testimony of the *Bullcoming* analyst, who also testified about results without performing or observing the test that generated those results.

¶ 41 The "text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Bullcoming*, 131 S.Ct. at 2716 (quoting *Crawford*, 541 U.S. at 54, 124 S.Ct. 1354). The constitutional guarantee that an accused be able to confront the witness against her, which is rooted in our common law tradition, must apply to the forensic evidence prevalent in criminal cases today. I would hold that admission of the lab report through Burbach's testimony violated the Confrontation Clause because the accused was denied the opportunity to confront the technician who actually performed the urinalysis. Hence, I respectfully dissent from Part II of the majority opinion.

---

7. *See United States v. Summers*, 666 F.3d 192, 196 (4th Cir.2011) (supervisor examined DNA evidence based on tests performed by two different analysts, one test taken from DNA on a jacket and one test taken from the defendant, prepared his own report comparing the two results, and reached conclusion that the DNA matched); *State v. Lopez*, 45 A.3d 1, 13–14 (R.I.2012) (supervisor took the results of DNA tests and used them to formulate a table and draw conclusions about whether the tested DNA matched the defendant's DNA). *Summers* and *Lopez* are similar to a host of other cases in which the testimony of supervisors who directly observed testing or conducted their own tests was held not to violate the Confrontation Clause. *See, e.g., Disharoon v. State*,291 Ga. 45, 727 S.E.2d 465, 467 (2012) (testifying technician performed all but one step of DNA analysis); *State v. Cabezuela*,150 N.M. 654, 265 P.3d 705, 715 (2011) (supervisor observed a pathology trainee perform an autopsy, wrote the autopsy report with the trainee, and testified as to her own conclusions about the victim's cause of death); *State v. McMillan*, 214 N.C.App. 320, 718 S.E.2d 640, 646–47 (2011) (supervisor was present at autopsy, observed pathologist perform the autopsy, and testified as to the supervisor's own conclusions about the victim's cause of death); *Jamerson v. State*, 383 S.W.3d 309, 312–13 (Tex.App.2012) (supervisor prepared own report on data and defendant cross-examined the supervisor on her own errors).

## III.

¶ 42 Although the Confrontation Clause issue is dispositive, I also address the majority's holding that Burbach's testimony satisfied section 16–3–309(5) because she "accomplished" the urinalysis by reviewing the data and signing the final report. Maj. op. ¶ 23.

¶ 43 Section 16–3–309(5) allows for reports from a forensic laboratory to be received in court "in the same manner and with the same force and effect as if the employee or technician ... who *accomplished* the requested analysis" testified in person. § 16–3–309(5) (emphasis added). The majority defines "accomplish" as "to execute fully: perform, achieve, fulfill." Maj. op. ¶ 21. Under this definition, the majority concludes, Burbach "accomplished" the urinalysis because she generated the final report. *Id.* ¶ 23.

¶ 44 Section 16–3–309(5) allows either party to request that the employee or technician testify in person. The legislature included the provision that a technician would testify on request in section 16–3–309(5) to protect the constitutional rights of the accused to confront the witness against her face to face. *SeeHearing on H.B. 1331 Before the House Judiciary Committee,* 54th General Assembly, 2d Reg. Sess., Feb. 14, 1984 (hearing tape 84–9 5:55 p.m.–7:00 p.m.). The bill's sponsor, Representative Don Mielke, noted that although the legislature's goal in enacting the statute was to make it easier to admit lab reports, the provision allowing the accused to request that the technician testify served as a "constitutional safeguard" ensuring that the rights of the accused were protected. *Hearing on H.B. 1331 before the Senate Judiciary Committee,* 54th General Assembly, 2d Reg. Sess. Feb. 29, 1984 (hearing tape 84–13 4:34 p.m.–4:50 p.m.).

¶ 45 A technician who performed a forensic test testifies as a percipient witness who perceived the results of the test through his or her own senses. See Mueller & Kirkpatrick, *Federal Evidence* § 6:6. To hold otherwise places a higher value on the convenience of state laboratory employees over the protection of the accused's confrontation rights and undermines the purpose of this statute, which is to preserve these rights.

¶ 46 The majority's conclusion stretches the meaning of "accomplish" to encompass a supervisor who signed off on a final report and performed no part of the urinalysis test. In my view, the person who "accomplished" the urinalysis according to the plain meaning of the word is the person who performed the test. Burbach did not perform any step of the urinalysis. Hence, I would hold that Burbach's testimony was not sufficient to satisfy section 16–3–309(5), and I respectfully dissent from Part III of the majority opinion.

I am authorized to state that Justice BOATRIGHT joins in the concurrence in part and the dissent in part.