Opinion by JUDGE DUNN
¶ 1 Defendant, Jorge Arturo Medrano-Bustamante, appeals the judgment of conviction entered on jury verdicts involving multiple charges. We remand to the trial court with directions to (1) merge defendant's conviction for leaving the scene of an accident involving serious bodily injury into his conviction for leaving the scene of an accident involving death; (2) vacate the sentence imposed as to the conviction for leaving the scene of an accident involving serious bodily injury; and (3) correct the mittimus accordingly. In all other respects, the judgment is affirmed.
I. Background
¶ 2 Defendant and two companions, Jose Medrano-Frias (Frias) and fifteen-year-old A.S., went to a barbeque where Frias and defendant drank beer. Shortly after leaving in defendant's car, the three men were involved in a single-car accident. While Frias sustained a fractured femur, A.S. died several hours after the accident.
¶ 3 As relevant here, defendant was charged with driving under the influence (DUI), vehicular homicide-DUI, vehicular assault-DUI, and two counts of leaving the scene of an accident.
¶ 4 At trial, the identity of the driver was contested. Defendant argued that A.S. was driving at the time of the accident. The prosecution argued that defendant was driving.
¶ 5 The jury convicted defendant as charged. The jury also convicted him of the lesser nonincluded offense of permitting a vehicle to be operated in an unlawful manner. The trial court sentenced defendant to an aggregate prison sentence of twelve years.
*586 II. Lesser Included Offense
¶ 6 Defendant contends that his DUI conviction merges with his convictions for vehicular assault-DUI and vehicular homicide-DUI because DUI is a lesser included offense of both of these offenses. We disagree.
¶ 7 Based upon prior decisions of divisions of this court, the People do not challenge defendant's contention that DUI is a lesser included offense of both vehicular homicide-DUI and vehicular assault-DUI. See People v. Cruthers, 124 P.3d 887 (Colo.App.2005) ; People v. Grassi, 192 P.3d 496, 500 (Colo.App.2008).[1] We are not bound by the decisions of other divisions of this court. People v. Moore, 321 P.3d 510, 513, 2010 WL 5013681 (Colo.App.2010) (cert. granted 2011 WL 4448964 (Sept. 26, 2011) ). Nor are we bound by the People's concessions regarding the interpretation of the law. See People v. Zubiate, 2013 COA 69, ¶ 22, 411 P.3d 757, 2013 WL 1909126.
¶ 8 Vehicular assault-DUI and vehicular homicide-DUI are in different provisions of the penal code than DUI. And they are identified with different titles. Compare § 18-3-205(1)(b)(I), C.R.S.2013, and § 18-3-106(1)(b)(I), C.R.S.2013, with § 42-4-1301(1)(a), C.R.S.2013. This legislative structure suggests that the legislature intended for these offenses to be separate. People v. Abiodun, 111 P.3d 462, 465 (Colo.2005) ("Where the general assembly proscribes conduct in different provisions of the penal code and identifies each provision with a different title, its intent to establish more than one offense is generally clear."). Accordingly, a court may impose a sentence for DUI separately from convictions for vehicular assault-DUI or vehicular homicide-DUI unless DUI is a lesser included offense of one or both of these offenses. See id . If it is, the convictions must merge. See People v. Vigil, 251 P.3d 442, 448 (Colo.App.2010).
¶ 9 To determine whether DUI is a lesser included offense, we apply the strict elements test. People v. Leske, 957 P.2d 1030, 1036 (Colo.1998). Under this test, we must determine whether the essential elements of DUI comprise a subset of the essential elements of vehicular assault-DUI or vehicular homicide-DUI, such that committing the greater offenses without also committing the lesser is impossible. People v. Garcia, 940 P.2d 357, 360 (Colo.1997) (citing Schmuck v. United States, 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) ). To perform this test, we compare the statutory elements. Id . at 359.
¶ 10 A person is guilty of vehicular assault-DUI if:
(1) he operates or drives
(2) a motor vehicle while
(3) under the influence of alcohol or one or more drugs, or a combination of both alcohol and one or more drugs, and
(4) this conduct is the proximate cause of a serious bodily injury to another.
See § 18-3-205(1)(b)(I). And a person is guilty of vehicular homicide-DUI if he commits elements (1) through (3) of vehicular assault-DUI and his conduct is the proximate cause of the death of another. See § 18-3-106(1)(b)(I).
¶ 11 To be convicted of DUI, a person must:
(1) drive
(2) a motor vehicle or vehicle while
(3) under the influence of alcohol or one or more drugs, or a combination of both alcohol and one or more drugs.
See § 42-4-1301(1)(a).
¶ 12 At first blush, the elements of DUI appear to be almost identical to a subset of elements in both vehicular assault-DUI and vehicular homicide-DUI. They differ, however, in a material way: To be found guilty of DUI, a person must drive a motor vehicle or vehicle as those terms are defined by the Uniform Motor Vehicle Law, and to be found guilty of vehicular assault or homicide, a person must drive or operate a motor vehicle as that term is defined in the criminal code.
*587 ¶ 13 The criminal code defines motor vehicle as "any self-propelled device by which persons or property may be moved, carried, or transported from one place to another by land, water, or air, except devices operated on rails, tracks, or cables fixed to the ground or supported by pylons, towers, or other structures." § 18-1-901(3)(k), C.R.S.2013. In contrast, the Uniform Motor Vehicle Law defines motor vehicle as any "self-propelled vehicle that is designed primarily for travel on the public highways and that is generally and commonly used to transport persons and property over the public highways or a low-speed electric vehicle; except that the term does not include low-power scooters, wheelchairs, or vehicles moved solely by human power." § 42-1-102(58), C.R.S.2013.
¶ 14 The criminal code's definition of motor vehicle is broader than the Uniform Motor Vehicle Law's definition of motor vehicle.[2] See Bertrand v. Bd. of Cnty. Commissioners, 872 P.2d 223, 228 (Colo.1994) ( "[T]he definitions contained in the Uniform Motor Vehicle Law are tailored to the unique objectives of that law."). Thus, vehicular assault-DUI and vehicular homicide-DUI can be committed in ways that DUI cannot. For example, vehicular assault-DUI and vehicular homicide-DUI might be committed while driving a boat or operating a plane. People v. Zweygardt, 2012 COA 119, ¶ 25, 298 P.3d 1018. But DUI may only be committed by driving a vehicle "designed primarily for travel on the public highways and that is generally and commonly used to transport persons and property over the public highways," or by driving a bicycle. § 42-1-102(58), (112), C.R.S.2013. Accordingly, it is possible to commit the greater offenses without also committing the lesser offense. See Garcia, 940 P.2d at 360.
¶ 15 Because a person can commit vehicular assault-DUI or vehicular homicide-DUI without necessarily committing DUI, we conclude that DUI is not a lesser included offense of vehicular assault-DUI or vehicular homicide-DUI. Cf. Zweygardt, ¶¶ 24, 25 (holding that careless driving is not a lesser included offense of vehicular assault (reckless) because the Uniform Motor Vehicle Law's and the criminal code's definitions of motor vehicle are different).
¶ 16 Consequently, we further conclude that the trial court did not err in entering separate judgments of conviction for vehicular assault-DUI, vehicular homicide-DUI, and DUI.
III. The Laboratory Reports
¶ 17 On the first day of trial, the prosecution filed its complete witness list including two state forensic laboratory employees, Joel Fay and Cynthia Burbach. Fay did not testify at trial. Instead, the prosecution called Burbach, the supervisor of the Colorado Department of Health toxicology lab. Through Burbach, the prosecution introduced reports of defendant's blood alcohol concentration (BAC) tests. The reports identified Fay as the analyst who performed the BAC testing, but bore Burbach's name and signature as the person who "reviewed and approved" the results of the testing.
¶ 18 Defendant contends that admitting the laboratory reports in the absence of Fay's testimony violated his right of confrontation under the United States and Colorado Constitutions as well as § 16-3-309(5), C.R.S.2013. We perceive no constitutional or statutory violation.
A. The Right to Confront
¶ 19 The right to confront and cross-examine witnesses is guaranteed by the Sixth Amendment and by Colorado constitution article II, section 16. People v. Russom, 107 P.3d 986, 992 (Colo.App.2004). This right applies to testimonial statements.
*588 Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ; Cropper v. People, 251 P.3d 434, 435 (Colo.2011).
¶ 20 Forensic laboratory reports are testimonial statements. Bullcoming v. New Mexico, 564 U.S. 647, 657-60, 131 S.Ct. 2705, 2713-14, 180 L.Ed.2d 610 (2011) ; Cropper, 251 P.3d at 436. Accordingly, for such a report to be admitted into evidence, a defendant must have an opportunity to cross-examine the person who prepared it. Id .
¶ 21 The United States Supreme Court considered the confrontation issues raised by the introduction of forensic laboratory reports and related testimony in Bullcoming. There, the prosecution introduced blood alcohol test results certified by a laboratory analyst. Bullcoming, 564 U.S. at 651, 131 S.Ct. at 2709. The prosecution did not call the analyst who certified the test to testify at trial. Id. at 657-58, 131 S.Ct. at 2713. Instead, it called another analyst who had no involvement in the test or the report.
¶ 22 The Court held that this "surrogate" testimony did not satisfy the defendant's right of confrontation. Id. In so holding, the Supreme Court explained that the surrogate testimony came from a person "who did not sign the certification or personally perform or observe the performance of the test reported in the certification." Id. Because the defendant did not have the opportunity to cross-examine the certifying analyst, the Court concluded that his right of confrontation was violated. Id . at 651-52, 131 S.Ct. at 2710.
¶ 23 After Bullcoming was decided, but while this appeal was pending, our supreme court analyzed whether the admission of a report through a laboratory supervisor violated a defendant's confrontation rights. See Marshall v. People, 2013 CO 51, ¶ 2, 309 P.3d 943. In that case, the prosecution also called Cynthia Burbach, as the laboratory supervisor, to testify about forensic lab results showing the level of narcotic present in the defendant's urine at the time of the charged offenses. Id. at ¶ 1. Although Burbach did not conduct the test of the defendant's urine sample herself, the supreme court nonetheless held that no confrontation clause violation occurred. In so holding, the court concluded that Burbach "did not provide 'surrogate' testimony" of the kind found to be problematic in Bullcoming because she (1) oversaw the testing process; (2) reviewed all the data generated by the test; (3) determined that the data accurately found the presence of a narcotic in the defendant's urine; and (4) certified the test results. Id. at ¶ 18.
¶ 24 Here, the record demonstrates that Burbach was involved in the certification of the BAC test. She testified that she is the supervising forensic toxicologist at the state forensic laboratory and supervises the analysis of blood samples to determine alcohol content. While she acknowledged that she did not perform the tests on defendant's blood samples, she explained that she was the person responsible for the "final review" of the analytical data. She testified that she reviewed all of the documentation to ensure that there was no human error and that "everything concurred in accordance with the standard operating procedure." Burbach further testified that her task is not limited to doublechecking results. Rather, she testified that she reviews "everything the analyst does" and she ensures that the "result is a true and accurate result before it leaves the laboratory." Burbach stated that when she is "convinced and ensured of that" the test result will bear her signature.
¶ 25 Based on the evidence presented, we conclude that, unlike the surrogate analyst in Bullcoming, who "had no connection with the particular lab report at issue," Marshall, ¶ 18, Burbach did have a connection to defendant's lab reports. She supervised and reviewed the process and, ultimately, approved and certified the lab report. Without Burbach's review and approval, the lab report would not be returned to the requesting law enforcement agency. Thus, once the lab report certified by Burbach was introduced through her testimony, she became a witness that defendant had the right to confront. See Marshall, ¶ 20. Because defendant cross-examined Burbach at trial, his confrontation rights were satisfied.
B. Section 16-3-309(5)
¶ 26 Defendant also claims that his rights under section 16-3-309(5) were violated *589 when the prosecution called Burbach to testify at trial because she was not the person who accomplished the requested analysis within the meaning of that statute. We disagree.
¶ 27 Section 16-3-309(5) allows criminalistics laboratory reports to be received in evidence "with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis, comparison, or identification had testified in person." The statute also states that "[a]ny party may request that such employee or technician testify in person at a criminal trial on behalf of the state before a jury or to the court, by notifying the witness and other party at least fourteen days before the date of such criminal trial."[3] Id . Thus, the statute recognizes a defendant's confrontation right, but also recognizes that if the right is not exercised, it is waived. Cropper, 251 P.3d at 435.
¶ 28 The evidence presented supports the conclusion that Burbach's review was necessary to finalize and certify the laboratory reports. Because the test results could not have been approved and certified without Burbach's review, we conclude that Burbach "performed the final and necessary step" in the testing process, and therefore accomplished the analysis. Marshall, ¶ 22. Accordingly, we discern no statutory violation.
C. Burbach's Opinion Testimony
¶ 29 Burbach opined that, based on defendant's BAC test results, defendant was under the influence of alcohol, substantially impaired by that drug, and unable to operate a motor vehicle safely. Defendant contends that this opinion was impermissible because it suggested to the jury how to decide the case. Because defendant did not object to this testimony, we review the contention only for plain error. See People v. O'Connell, 134 P.3d 460, 463 (Colo.App. 2005). We perceive none.
¶ 30 Plain error assumes that the trial court should have intervened sua sponte because the error was obvious. People v. Petschow, 119 P.3d 495, 505 (Colo.App.2004). It is error that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. People v. Grant, 174 P.3d 798, 806 (Colo.App.2007).
¶ 31 Burbach's opinions were based on her knowledge of alcohol absorption, the blood test results, and how alcohol affects a person's perceptions. Burbach did not opine that the presence of alcohol in defendant's blood was a proximate cause of Frias's injuries or A.S.'s death. See § 18-3-205(1)(b)(I) (a person commits vehicular assault-DUI when he or she operates a motor vehicle while under the influence of alcohol, drugs, or both, and this conduct is the proximate cause of serious bodily injury); § 18-3-106(1)(b)(I) (vehicular homicide).
¶ 32 Thus, even attributing some error to the testimony, we cannot say that the admission of Burbach's opinions was so obviously erroneous that the trial court should have sua sponte precluded the testimony absent an objection. Nor can we conclude that the limited testimony undermined the fundamental fairness of the trial.
IV. Hearsay Statements
¶ 33 Defendant next contends that his confrontation rights were violated when the trial court admitted hearsay statements made by A.S. to four separate individuals. Each of the individuals testified that A.S. said he was in the back seat of the car at the time of the accident. Because we conclude that the statements were nontestimonial, no confrontation rights attached.
A. Pertinent Events
¶ 34 The trial court held a hearing on the admissibility of the hearsay statements. The first witness, Keri Andersen, testified that her family was driving home when they realized there had been a car accident. She testified that they stopped and she attended to A.S., who was lying on the ground on the driver's side of the car. She attempted to keep him calm, but "he was in a lot of pain and thrashing." In an attempt to "distract him from the pain" and keep him still, Andersen *590 started asking him questions. She asked him his name, his age, whether he was driving, and whether he had been thrown from the car. He responded that he had been lying down in the back seat, and had crawled out of the car after the accident. Andersen testified that she asked these questions to "make sure everyone was accounted for ... because of the nature of the crash, [she wasn't] sure if there was still another person around." And she testified that, although she called 911, she was not directed to ask questions by law enforcement officers. Andersen further testified that her primary concern was A.S.'s health and safety.
¶ 35 Andersen's son testified that he was with his mother when she was questioning A.S. and that A.S. was in "excruciating pain." He further testified that he heard A.S.'s statement that he had been lying in the back seat at the time of the crash and had crawled out of the car.
¶ 36 A paramedic testified that, when she arrived on the scene, A.S. was in a great deal of pain. She testified that she asked A.S. a series of questions to assist her in treatment decisions. Among other statements, A.S. told the paramedic that he "was a restrained back seat passenger," seated behind the driver, and that he had crawled out of the car.
¶ 37 The trial court found that A.S.'s statements "were excited utterances, or alternatively that they should be admitted under the residual exception to the hearsay rule." The court also found that the statements were not testimonial. Accordingly, the court allowed Andersen, her son, and the paramedic to testify at trial regarding A.S.'s hearsay statements.
¶ 38 In addition, at trial, the surgeon who treated A.S. at the hospital testified that, in response to questioning, A.S. told him that "he was a restrained back seat passenger" in a car that had hit a telephone pole, and that he had not been drinking alcohol.
B. Testimonial Versus Nontestimonial Statements
¶ 39 If hearsay is nontestimonial, the Confrontation Clause is not implicated. See Michigan v. Bryant, 562 U.S. 344, 354-55, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011) (noting that Crawford limited the "reach" of the Confrontation Clause to testimonial statements); Arteaga-Lansaw v. People, 159 P.3d 107, 109 (Colo.2007). Whether a statement is testimonial is a question of law subject to de novo review. People v. Trevizo, 181 P.3d 375, 378 (Colo.App.2007).
¶ 40 To determine whether a statement is testimonial, we objectively examine the "primary purpose" of the interrogation that produced it. See People v. Phillips, 2012 COA 176, ¶ 70 ; Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) ; see also Vigil, 127 P.3d at 922 (examining whether statements made to a doctor during a sexual assault examination were the functional equivalent of police interrogation by determining "whether and to what extent government officials were involved in producing the statements"). If the primary purpose of the interrogation is to "enable police assistance to meet an ongoing emergency," any statements flowing from such inquiry are not testimonial. Davis, 547 U.S. at 822, 126 S.Ct. 2266. But if the primary purpose of the interrogation is "to establish or prove past events potentially relevant to later criminal prosecution," any resulting statements are testimonial, triggering the Confrontation Clause. Id.
¶ 41 "The primary purpose of an interrogation is determined by objectively evaluating two main elements: (1) the circumstances in which the encounter occurred, and (2) the statements and actions of both the declarant and interrogator." Phillips, ¶ 70. In evaluating the first element, we consider such factors as where the encounter occurred, whether it was during or after an ongoing emergency, and the formality of the interrogation. See id. And in evaluating the second element, we examine "factors such as the nature of what was asked and answered" and "the purpose that reasonable participants would have had, rather than the subjective or actual purpose of the individuals involved." Id.
¶ 42 Here, the evidence establishes that Andersen, her son, and the paramedic were *591 all first responders to an ongoing emergency. They encountered a serious car crash with at least two, and potentially more, victims. The primary purpose of the questions directed to A.S. had nothing to do with creating a trial record. Rather, objectively viewed, the questions were aimed at calming A.S., evaluating his injuries, determining his treatment, and ascertaining the existence of other possible victims. We therefore conclude A.S.'s hearsay statements to Andersen, her son, and the paramedic were not testimonial.
¶ 43 Similarly, the statements A.S. made to the treating surgeon were not testimonial. The surgeon testified that he asked questions to determine A.S.'s "injury patterns" and potential medical conditions that would influence what type of medical decision-making was necessary. Again, there is no evidence that law enforcement agents were involved in or directed the questions. We conclude that, objectively, the primary-if not sole-purpose of these questions was to assess and treat A.S.'s injuries, and thus, the statements were not testimonial. See Vigil, 127 P.3d at 923.
¶ 44 Accordingly, given that A.S.'s statements were not testimonial, defendant's federal constitutional right of confrontation was not implicated. See Bryant, 562 U.S. at 378-79, 131 S.Ct. at 1167.[4]
V. Expert Testimony
¶ 45 Defendant contends that the trial court abused its discretion in admitting the expert opinion of a medical examiner about where defendant and A.S. were likely sitting when the accident occurred. We disagree.
¶ 46 Before trial, the prosecution notified defense counsel of its intent to introduce the expert testimony of Dr. James Wilkerson, the medical examiner who conducted A.S.'s autopsy. The prosecutor stated that, based on Dr. Wilkerson's training and experience as a forensic pathologist, and based on his analysis of A.S.'s injuries, he would testify that A.S. was not in the driver's seat at the time of the accident. Dr. Wilkerson would also testify, based on observing photographs of defendant's injuries, that his injuries were consistent with defendant having been in the driver's seat. Defendant moved to preclude Dr. Wilkerson's testimony and requested a hearing pursuant to People v. Shreck, 22 P.3d 68 (Colo.2001).
¶ 47 After conducting a Shreck hearing, the trial court found that Dr. Wilkerson's proffered testimony was relevant and useful, and that its probative value was not substantially outweighed by the danger of unfair prejudice. The court further found that Dr. Wilkerson, by virtue of his training and experience, was qualified to testify in the field of forensic pathology. Finally, the court found that the scientific principles underlying the testimony were reasonably reliable.
¶ 48 Defendant argues that the trial court improperly assumed the role of advocate by asking Dr. Wilkerson questions during the Shreck hearing. As a result, defendant asserts that the prosecution failed to meet its burden under CRE 702. In the alternative, defendant argues that, even if we consider Dr. Wilkerson's answers to the court's questions, the trial court erred in concluding that Dr. Wilkerson's opinions were based on reasonably reliable scientific principles, and that he was qualified to render such opinions. We reject these arguments.
A. Judge as Advocate
¶ 49 Because defendant did not object to the trial court's questioning, we review it for plain error. People v. Miller, 113 P.3d 743, 749-50 (Colo.2005) ; cf. People v. Cook, 197 P.3d 269, 275 (Colo.App.2008) (applying plain-error standard of review to juror question to which no contemporaneous objection was made).
¶ 50 To determine whether a judge has committed reversible error by improperly assuming the role of advocate, we examine *592 whether the judge's conduct "so departed from the required impartiality as to deny the defendant a fair trial." People v. Adler, 629 P.2d 569, 573 (Colo.1981). Under the circumstances presented here, we conclude that the trial court did not commit any error, let alone plain error.
¶ 51 A trial court is required to perform a gatekeeping role before admitting expert testimony. People v. Wilson, 2013 COA 75, ¶ 22, 318 P.3d 538, 2013 WL 2285809. In this regard, it sits as the factfinder during a Shreck hearing, and must satisfy itself that the proffered scientific evidence is reliable and relevant. See id. ; see also United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir.2009).
¶ 52 After the prosecutor examined and defense counsel cross-examined Dr. Wilkerson, the court asked additional questions about Dr. Wilkerson's technique and experience. The court's questions served to aid the court in determining whether the expert testimony was admissible. The nature of the questions reflect that the court was not advocating a position but rather was seeking to "satisfy itself"-in its gatekeeper role-that the proffered scientific evidence was reliable. See Nacchio, 555 F.3d at 1241. After the court questioned the proposed expert, the court invited the prosecutor and defense counsel to ask additional questions. Both sides accepted the invitation and further questioned Dr. Wilkerson. Based on the record, the court's questions were not of such a nature as to transform the court from neutral gatekeeper to advocate for the prosecution.
¶ 53 Defendant's reliance on People v. Martinez, 185 Colo. 187, 523 P.2d 120 (Colo.1974), is misplaced. There, the trial court conducted a hearing, moved for the admission of evidence, called witnesses for the People, conducted both direct and cross-examination, made objections to defense counsel's questions, and ruled on objections made to its own questions. Id . at 188-89, 523 P.2d at 120-21. Here, the trial court did none of these things. Accordingly, Martinez is inapposite.
B. Admissibility of Dr. Wilkerson's Testimony
¶ 54 We further conclude that the trial court did not abuse its discretion in determining that Dr. Wilkerson's opinions were based on reasonably reliable scientific principles, and that Dr. Wilkerson was qualified to render them.
¶ 55 Dr. Wilkerson testified at the Shreck hearing that he had been a forensic pathologist for eighteen years, and that his work was "concerned with the cause and manner of death as well as mechanisms of injury or death." He testified that he was knowledgeable about the types of injuries that occur as a result of various car accidents, including a frontal crash, a side crash, a rollover, or an ejection.
¶ 56 Dr. Wilkerson testified that the techniques used in arriving at his opinions are generally accepted in the field of forensic pathology. He also testified that the technique a forensic pathologist employs in determining how a person involved in a car accident received his injury is "basically a comparison of the injuries to the vehicle and objects in the vehicle and then a general knowledge of what [happened] to the vehicle." He further testified that (1) he had read peer-reviewed journal articles that dealt with the technique of determining the positioning of persons in a vehicle based on their observed injuries; (2) it is a normal and generally accepted part of his profession to keep up with those types of journal articles; and (3) the opinions that he expressed in court were within the norm of the technique that is generally accepted in the field of forensic pathology.
¶ 57 Dr. Wilkerson also testified that he had worked on over 1,200 cases involving automobile accidents, and 125 to 150 of them required him to determine where people were seated at the time of the accident. And he stated that he had previously been qualified as an expert.
¶ 58 With respect to A.S.'s flesh injuries, Dr. Wilkerson opined that they were "dicing" injuries, caused by the cube-shaped pieces that form when tempered glass breaks. Dr. Wilkerson testified that A.S. also had "overstretched"
*593 injuries on his right side, and a "squared-off" injury on the top of his head that matched a steel brace in the roof liner of the car. Because tempered glass is found in the windows, but not the windshield, of a vehicle, and because A.S.'s dicing injuries occurred primarily on his right side, Dr. Wilkerson opined that these injuries were the result of coming into contact with the right-side window of the car. And based on the location of the steel brace and the pattern of A.S.'s head injury, Dr. Wilkerson opined that A.S. was likely in the backseat of the car at the time of the accident.
¶ 59 Finally, Dr. Wilkerson opined that defendant's injuries, which were abrasions to his clavicle and the front side of his right shoulder, were consistent with striking the roof, which collapsed over the driver's seat.
¶ 60 The defense cross-examined Dr. Wilkerson, but presented no witnesses at the Shreck hearing.
¶ 61 In determining whether expert testimony is reliable and relevant, and therefore admissible, trial courts are vested with broad discretion. People v. Martinez, 74 P.3d 316, 322 (Colo.2003). Because "[a] trial court has a superior opportunity to determine the competence of the expert as well as assess whether the expert's opinion will be helpful to the jury," we will not reverse such a determination unless it is manifestly erroneous. Id.
¶ 62 In making this determination, the trial court is required to find that (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the testimony will be helpful to the jury; and (4) the probative value of the testimony is not substantially outweighed by the danger of unfair prejudice. Shreck, 22 P.3d at 77, 79 ; see CRE 702, 403.
¶ 63 To carry out its role as gatekeeper, a trial court must weigh and consider the admissibility of the proposed expert testimony in light of the following factors: (1) whether the technique can and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has been generally accepted; (4) the existence of specialized literature dealing with the technique; and (5) whether such evidence has been offered in previous cases to support or dispute the merits of a particular scientific procedure. Shreck, 22 P.3d at 77-78. Because the determination of reliability is flexible, not all factors apply to all experts or in every case. See id. ; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (inquiry into whether testimony is based on scientific, technical, or "other specialized" knowledge should be flexible).
¶ 64 Based on the testimony at the Shreck hearing, the trial court made the following findings:
? Dr. Wilkerson would not be testifying as an accident reconstructionist, but rather as a forensic pathologist concerning the cause and manner of A.S.'s death and the possible mechanisms of injury to both A.S. and defendant.
? Dr. Wilkerson was qualified to testify as an expert in the field of forensic pathology because he was a board-certified medical doctor in anatomic, clinical, and forensic pathology, and because he had "specifically conducted hundreds ... of autopsies, [and] expressed opinions in motor vehicle accidents in which victims were injured or killed as to their position in the vehicle based on their injuries."
? Under the totality of the circumstances, the scientific techniques that are used in forensic pathology to determine the cause and manner of death, and the mechanisms of injury or death, are reasonably reliable. Specifically, the scientific technique used in this case is based on physical and photographic observation of injuries, in combination with "reading the incident reports, viewing the damage to the vehicle, both inside and out, as well as the other investigations that are conducted by the medical examiner's office [and] the state patrol...."
? The scientific technique is a "theory technique" that is generally accepted, *594 "described in specialized literature regarding motor vehicle accidents," and subject to peer review.
¶ 65 The record supports the trial court's findings. Accordingly, we conclude that the trial court did not abuse its considerable discretion in admitting Dr. Wilkerson's testimony.
VI. Res Gestae Evidence
¶ 66 Before trial, the prosecution moved to admit evidence that, roughly four hours before the accident, a person fitting defendant's description was seen erratically driving defendant's car at a high rate of speed. Defendant argued that this evidence was inadmissible other act evidence under CRE 404(b). The trial court allowed the prosecution to present the evidence as res gestae of the charged crime, finding that it constituted "one continuous course of action that culminated, ... according to the prosecution's theory of the evidence, in [defendant] committing the crimes that he is charged with." Defendant contends that this was reversible error. We disagree.
¶ 67 Defendant argues that the challenged evidence was not relevant to the material issues before the jury. Specifically, he argues that, because defendant's car was stopped for several hours preceding the accident, the evidence was not probative of who was driving when the accident occurred.
¶ 68 While it is true that the reported reckless driving occurred four hours before the accident, and was interrupted by a barbeque, the mere passage of time does not make the evidence extrinsic to the crime. People v. Gladney, 250 P.3d 762, 768 (Colo.App.2010). However, assuming for the sake of argument that defendant is correct, we conclude that any error in the admission of the evidence was harmless. Contrary to defendant's assertion, the following significant evidence was presented that he was driving at the time of the accident:
? Defendant's blood was found on the driver's seat.
? The majority trace DNA profile found on the steering-wheel cover belonged to defendant, and no DNA from either of the other two passengers was found on the steering wheel cover.
? Defendant's injuries were consistent with striking the collapsed roof above the driver's seat.
? A.S.'s injuries were not consistent with the types of injuries drivers typically receive, but were consistent with being in the back seat.
? A.S.'s head injury was consistent with his head hitting a steel brace under the roof liner in the backseat of the car.
? A.S.'s forcefully removed hairs were found on the roof liner which covered the steel brace, to the exclusion of defendant.
? A.S. told his treating physician and the first responders that he was in the backseat at the time of the crash.
¶ 69 In light of this evidence, we cannot conclude that the testimony that someone matching defendant's description was seen driving defendant's car prior to the accident substantially influenced the verdict or affected the fairness of the trial. See People v. Lehnert, 131 P.3d 1104, 1109 (Colo.App.2005) (concluding that evidence should not have been admitted as res gestae, but it was nonetheless harmless in light of other testimony and physical evidence) rev'd on other grounds, 163 P.3d 1111 (Colo.2007).
VII. Leaving the Scene of an Accident
¶ 70 Defendant was charged with two counts of leaving the scene of an accident, one for Frias and one for A.S. He was convicted of both charges. Defendant contends that these convictions are multiplicitous because the statutorily defined unit of prosecution for leaving the scene of an accident is the number of accident scenes, not the number of victims injured in a given scene. In addition, he contends that there was insufficient evidence to support his convictions. We agree, in part.
A. Multiplicity
¶ 71 "Where a reviewing court finds a double jeopardy violation, regardless of whether the issue was raised in the trial court, the defendant is entitled to appropriate *595 relief on appeal." People v. Arzabala, 2012 COA 99, ¶ 19, 317 P.3d 1196, 2012 WL 2353784 ; see also People v. Tillery, 231 P.3d 36, 47-48 (Colo.App.2009), aff'd sub nom. People v. Simon, 266 P.3d 1099 (Colo.2011) (even under a plain-error analysis, an unpreserved double jeopardy error will invariably mean a defendant is entitled to relief on appeal); but see 231 P.3d at 52 (Bernard, J., specially concurring). Thus, notwithstanding defendant's failure to preserve this issue, we review de novo his claim that his convictions violate the constitutional protection against double jeopardy. Arzabala, ¶ 19.
¶ 72 Multiplicity is the charging of the same offense in more than one count, resulting in multiple punishments for the same criminal conduct. Quintano v. People, 105 P.3d 585, 589 (Colo.2005). Multiplicitous convictions violate the constitutional prohibition against double jeopardy. Woellhaf v. People, 105 P.3d 209, 214 (Colo.2005).
¶ 73 To determine whether a defendant's conduct supports multiple convictions, we first identify the legislatively prescribed unit of prosecution. Vigil, 251 P.3d at 448. Then, we determine whether, based on the evidence, the defendant's conduct constituted more than one factually distinct offense. Id . If the convictions are not based on separate offenses, they merge with one another. Id .
¶ 74 In Arzabala, a division of this court concluded-based upon a plain-language analysis-that the unit of prosecution for leaving the scene of an accident is "the number of accident scenes, not the number of victims in any given accident." Arzabala, ¶ 41. Despite the People's contention that Arzabala was wrongly decided, we agree with that division's well-reasoned conclusion that the unit of prosecution is the number of accident scenes and not the number of victims.
¶ 75 Here, defendant was involved in, and left the scene of, a single accident. We therefore conclude that defendant's two convictions for leaving the scene of a single accident violate his right to be free from double jeopardy.
¶ 76 Leaving the scene of an accident involving serious bodily injury is a class 4 felony, and leaving the scene of an accident involving death is a class 3 felony. See § 42-4-1601(2)(b), (c), C.R.S.2013. Because the effect of a jury's verdict should be maximized, People v. Glover, 893 P.2d 1311, 1314 (Colo.1995), we remand to the trial court with directions to (1) merge defendant's conviction for leaving the scene of an accident involving serious bodily injury into his conviction for leaving the scene of an accident involving death; (2) vacate the sentence imposed as to the conviction for leaving the scene of an accident involving serious bodily injury; and (3) correct the mittimus accordingly.
B. Sufficiency of the Evidence
¶ 77 Having concluded that defendant's two convictions must merge into one, we now address whether there was sufficient evidence to support the remaining conviction for leaving the scene of an accident involving death. We conclude that there was.
¶ 78 We review the evidence as a whole and in the light most favorable to the prosecution to determine whether a jury could rationally conclude beyond a reasonable doubt that the defendant is guilty of the charged offense. People v. Sprouse, 983 P.2d 771, 777 (Colo.1999).
¶ 79 Section 42-4-1601(1), C.R.S.2013, requires "[t]he driver of any vehicle directly involved in an accident resulting in injury to, serious bodily injury to, or death of any person" to "remain at the scene of the accident until the driver has fulfilled the requirements of section 42-4-1603(1), [C.R.S.2013]."
¶ 80 Section 42-4-1603(1) requires such a driver to "give the driver's name, the driver's address, and the registration number of the vehicle he or she is driving ... to the person struck or the driver or occupant of or person attending any vehicle collided with...." It "also requires a driver to render 'reasonable assistance' to any person injured in the accident and, thereafter, to report the accident to police if no officer is present." People v. Hernandez, 250 P.3d 568, 571 (Colo.2011). Sections 42-4-1601(1) and 42-4-1603(1) further "require a driver of a vehicle involved in an accident to affirmatively identify himself as the driver before leaving the scene of the accident if that fact is not otherwise reasonably *596 apparent from the circumstances." Hernandez, 250 P.3d at 575.
¶ 81 Sufficient evidence was presented that defendant was the driver of the car. In addition, evidence was presented that defendant did not identify himself as the driver, did not affirmatively assist any of the victims, and did not report the accident to law enforcement. Rather, the Andersen family drove by the scene and stopped to assist the accident victims. Defendant was standing at the rear of the car. When Andersen asked him if he was the driver, defendant said he was not. And instead of assisting any of the accident victims, defendant was standing near the trunk of the car with his hands crossed. Upon arriving at the accident, it was Andersen who called 911 to report the accident. When a law enforcement officer arrived, defendant stated that he was not involved in the accident, but rather was a family member who had just arrived. Defendant later left the scene with a friend. No evidence was presented that defendant rendered any assistance to either victim before he left the scene.
¶ 82 Viewed as a whole and in the light most favorable to the prosecution, sufficient evidence was presented to allow the jury to conclude that defendant (1) was the driver of the vehicle involved in the accident; (2) did not "affirmatively identify himself as the driver before leaving the scene of the accident," id. at 575 ; (3) did not render "reasonable assistance" to his passengers; and (4) did not report the accident to the police before law enforcement arrived. See id. at 571 ; see also §§ 42-4-1603(1), (2) ; 42-4-1606, C.R.S.2013.
¶ 83 To the extent defendant presented evidence that he was not the driver, the resolution of conflicting testimony and evidence is for the jury. See People v. McIntier, 134 P.3d 467, 471 (Colo.App.2005) ("[I]t is the fact finder's function in a criminal case to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence."). Because there was evidence to support a conclusion that defendant was the driver, we will not disturb that finding. See id. at 472.
¶ 84 Defendant nonetheless argues that his conviction cannot be sustained under Lumbardy v. People, 625 P.2d 1026 (Colo.1981). In Lumbardy, the supreme court held that a defendant involved in a single-car accident could not be convicted under a statute that imposed a duty to report information "to the person struck or the driver or occupant of or person attending any vehicle collided with." 625 P.2d at 1027 (quoting § 42-4-1603(1), then codified at § 42-4-1403(1)). Lumbardy, however, involved a single-car accident with minor property damage and no personal injuries. That is not this case. Specifically recognizing this difference, the Lumbardy court stated that its holding "should not be construed to relieve [a] driver ... of the duty to render reasonable assistance to a passenger injured in [a single-car] accident." 625 P.2d at 1028 n.2. Thus, Lumbardy lends no support to defendant's contention.
¶ 85 We therefore conclude that there was sufficient evidence to support defendant's remaining conviction for leaving the scene of an accident.
VIII. Jury Instructions
¶ 86 Before trial, defendant requested that the jury be instructed on the lesser nonincluded offenses of permitting a vehicle to be operated in an unlawful manner, § 42-4-1704, C.R.S.2013, and false reporting, § 18-8-111(1)(b), C.R.S.2013. The trial court gave defendant's proposed instruction on permitting a vehicle to be operated in an unlawful manner, but denied the false reporting instruction. Defendant now contends that (1) the jury's verdicts finding him guilty of vehicular homicide-DUI, vehicular assault-DUI, and leaving the scene of an accident are inconsistent with the jury's verdict finding him guilty of permitting a vehicle to be operated in an unlawful manner, and (2) the court's decision not to give the false reporting instruction deprived him of the ability to argue his theory of defense. We disagree.
A. Permitting a Vehicle to be Operated in an Unlawful Manner
¶ 87 Under the doctrine of invited error, a party may not complain on appeal *597 of an error that he injected into the case. People v. McCoy, 944 P.2d 584, 589 (Colo.App.1996). This doctrine applies to jury instructions requested by a defendant. Id.
¶ 88 Here, defendant tendered a jury instruction that included the following language: "You may find the defendant guilty of Permitting a Vehicle to be Operated in an Unlawful Manner in addition to any of the other charged counts." The trial court instructed the jury as requested.
¶ 89 Because defendant specifically requested and received an instruction which authorized the jury to find him guilty of permitting a vehicle to be operated in an unlawful manner, in addition to any of the other charged counts, we conclude that defendant may not complain on appeal that he was so convicted. Any error was invited. Cf. id. (where a defendant specifically asked the trial court that the jury be instructed on a lesser included offense, and such an instruction was given to the jury, he could not be "heard to complain of his conviction on the lesser included offense vis-a-vis the other convictions").
B. False Reporting
¶ 90 A lesser nonincluded offense instruction is tantamount to a theory of the case instruction and is strategic. People v. Wartena, 2012 COA 12, ¶ 36, 296 P.3d 136. But before a court will give a lesser nonincluded offense instruction, a defendant must show an evidentiary basis upon which the jury could rationally acquit on the greater but convict on the lesser offense. People v. Rubio, 222 P.3d 355, 361 (Colo.App.2009) ; see also People v. Trujillo, 83 P.3d 642, 645 (Colo.2004) ; Garcia, 940 P.2d at 361.
¶ 91 The offense of false reporting occurs when "[a person] makes a report or knowingly causes the transmission of a report to law enforcement authorities of a crime or other incident within their official concern when he knows that it did not occur." § 18-8-111(1)(b). These elements are distinct from the elements necessary to prove the greater offenses of vehicular homicide-DUI, § 18-3-106 (1)(b)(I), vehicular assault-DUI, § 18-3-205(1)(b)(I), DUI, § 42-4-1301(1)(a), and leaving the scene of an accident, § 42-4-1601(1). That is, even assuming a jury found defendant guilty of false reporting, such a finding would not also require a finding that defendant was not the driver of the car. Nor would it tend to disprove or negate any elements of the greater charges. Accordingly, the trial court properly refused to give a false reporting instruction because there is no evidentiary basis upon which the jury could both rationally acquit on the greater charges but convict on the false reporting charge. See Rubio, 222 P.3d at 361.
¶ 92 Further, the failure to instruct on false reporting did not prevent defendant from presenting his theory that A.S. was driving the car at the time of the accident. Frias testified that A.S., not defendant, was driving the car at the time of the accident. And defense counsel so argued in closing argument. Thus, any error in refusing to give the false reporting instruction was harmless because it did not prohibit defendant from presenting his theory of defense. See Rubio, 222 P.3d at 361-62.
IX. Sentence Reconsideration
¶ 93 After trial, defendant moved for reconsideration of his sentence under Crim. P. 35(b). The district court denied defendant's motion, finding that the sentence originally imposed was "just and appropriate." Among other things, the court found that defendant (1) caused the death of A.S., who was only fifteen, and caused serious bodily injury to Frias; (2) aggravated his crimes not only by using alcohol, but also by leaving the scene of the accident when there was evidence that A.S. was moaning and crying in extreme pain; and (3) told people who arrived to help that he had nothing to do with the accident. Citing People v. Piotrowski, 855 P.2d 1 (Colo.App.1992), the trial court also stated that it could not reduce a sentence based solely upon consideration of a defendant's performance while incarcerated.
¶ 94 Defendant contends that the court abused its discretion by basing its ruling on an erroneous interpretation of the law. Namely, he argues that the court was not entitled to rely on Piotrowski because "it is *598 inconsistent" with decisions of divisions of this court and our supreme court.
¶ 95 Assuming, for the sake of argument, that Piotrowski is inconsistent with supreme court precedent, we nonetheless conclude that the district court did not abuse its discretion because it did not base its ruling on that case. Rather, the court made detailed findings about the severity of, and the aggravating circumstances surrounding, defendant's crimes. And the court ultimately concluded that it could not "envision a scenario in which sufficient mitigation could be produced ... to convince the [c]ourt" to reduce the sentence originally imposed. Thus, even assuming that the court could have reduced defendant's sentence based solely on his performance while incarcerated, given the court's specific findings, the record reflects that it would not have done so. Accordingly, we perceive no abuse of discretion.
X. Conclusion
¶ 96 The case is remanded to the trial court with directions to (1) merge defendant's conviction for leaving the scene of an accident involving serious bodily injury into his conviction for leaving the scene of an accident involving death; (2) vacate the sentence imposed as to the conviction for leaving the scene of an accident involving serious bodily injury; and (3) correct the mittimus accordingly. In all other respects, the judgment is affirmed.
JUDGE WEBB concurs in part and dissents in part.
JUDGE BERNARD concurs in part and dissents in part.

Under the views expressed in Cruthers and Grassi, DUI satisfies the "strict elements test" for a lesser included offense because its elements must necessarily be proved to sustain a conviction for vehicular homicide, Grassi, 192 P.3d at 500, or vehicular assault, Cruthers, 124 P.3d at 890.

The Uniform Motor Vehicle Law additionally defines vehicle as "a device that is capable of moving itself, or of being moved, from place to place upon wheels or endless tracks." § 42-1-102(112), C.R.S.2013. This definition "includes, without limitation, a bicycle, electrical assisted bicycle, or [electric personal assistive mobility device], but does not include a wheelchair, off-highway vehicle, snowmobile, farm tractor, or implement of husbandry designed primarily or exclusively for use and used in agricultural operations or any device moved exclusively over stationary rails or tracks or designed to move primarily through the air." Id. The criminal code's definition of motor vehicle is also broader than this definition.

There is no dispute that defendant filed a timely notice under section 16-3-309(5).

Defendant does not argue that, if the statements were nontestimonial, the statements violated his confrontation rights under the Colorado Constitution. See Phillips, ¶¶ 55-59 (discussing consideration of nontestimonial evidence under the Colorado Confrontation Clause). Because defendant has not developed such an argument, we decline to consider it. See People v. Simpson, 93 P.3d 551, 555 (Colo.App.2003) (declining to consider a legal proposition presented without argument or development).