23CA0433 Peo v Marentes 01-08-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0433
City and County of Denver District Court No. 21CR570
Honorable Jay S. Grant, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Edwin Marentes,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Grove, J., concurs
Schutz, J., specially concurs

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Edwin Marentes, appeals the district court's judgment of conviction entered on a jury verdict finding him guilty of felony murder. He also appeals the district court's sentence. We affirm.

## I.     Background

¶ 2      Marentes and his nephew went to a party at his nephew's friend's apartment. A group of about eight or nine people attended the party, including, among others, party host J.P-D. (also known as Junior), M.Z., and S.D. At the party, sixteen-year-old M.Z. communicated with nineteen-year-old Imanol Del Valle, the victim in this case, on Snapchat, as she had in the past (though she hadn't previously met him).[1] Previously, Del Valle had sent M.Z. messages that included pictures of his genitals, and she had told him to stop. M.Z. complained to the other partygoers about Del Valle's messages because of their age difference, erroneously believing that Del Valle was in his mid-to-late twenties.

---

[1] Snapchat is a social media platform on which users can send photos, videos, and messages that often disappear after being viewed.

¶ 3    The prosecution's theory of what happened next went as follows.  The partygoers had been drinking and doing drugs.  M.Z., S.D., Junior, and Marentes were upset that Del Valle, who they believed was much older than M.Z., had sent her pictures of his genitals.  So they formed a plan to rob Del Valle.  Marentes told M.Z. to tell Del Valle she wanted to meet to have a threesome with him, and she did.  Marentes and Junior also told M.Z. where to meet Del Valle.

¶ 4    Six people left the party to meet Del Valle: Marentes and Junior each went armed with guns, and M.Z., S.D., Marentes' nephew, and a driver from the party joined them.  Marentes turned his phone off on the way.  When they arrived at the meeting spot, Marentes and Junior walked to the dark margins of the street, M.Z. and S.D. walked to a well-lit area, and Marentes' nephew stayed in the car with the driver.  When Del Valle arrived, M.Z. — following Marentes' instructions — pretended to be drunk and fell down in the street to coax Del Valle out of his car.  Del Valle opened his door and got out to help M.Z. up.  He also took S.D.'s phone out of her hand, thinking it was his, and accidentally dropped it.

2

¶ 5　　As Del Valle bent over to pick up the phone, Marentes and Junior came out of the shadows and ambushed him. With their guns raised and pointed at Del Valle, Marentes and Junior shouted at him that he was being robbed. Del Valle quickly got back into his car and started to drive away. As he did, Marentes and Junior shot at him, hitting him four times. One shot from Marentes hit Del Valle in the head, killing him.

¶ 6　　The group returned to the party. Marentes and Junior bragged about killing Del Valle and told the other witnesses not to tell anyone about what had happened.

¶ 7　　The defense — relying on Marentes' testimony — said the night unfolded differently. Marentes said, "The alcohol was running low" at the party. So M.Z. and others planned to temporarily leave the party and get alcohol from Del Valle by using their "female charm." The group of six left to meet with Del Valle, with Marentes and Junior joining for "protection" from Del Valle, whom they believed to be a much older man. When they arrived, Marentes' drinking had caught up to him. He walked off to the dark margins of the street to urinate.

¶ 8     Del Valle arrived a few minutes later.  Marentes said he had to urinate a second time.  After doing so, he turned around and saw M.Z. on the ground and Del Valle out of his car grabbing S.D.'s phone.  Marentes started running toward Del Valle, who got back into his car.  Marentes saw Del Valle reaching for his vehicle's center console, and he believed Del Valle was reaching for a gun.  Marentes then pulled out his gun.  After hearing what he thought was a gunshot, Marentes began shooting at Del Valle in self-defense.  Del Valle then drove off and crashed the vehicle; and he died the following day from the shot to his head.

¶ 9     The parties don't dispute the relevant events after that evening.  About a week later, a police officer saw Marentes, who ran away from the officer.  The officer followed, detained him, and patted him down, finding an ammunition magazine in Marentes' pocket.  Officers found a gun on the ground behind a car Marentes had briefly crouched behind during the chase.  No magazine was in the gun.  The police later determined that the gun was the murder weapon.

¶ 10    The People charged Marentes with first degree murder after deliberation and felony murder.  Marentes asserted that he had

4

acted in self-defense. The jury found Marentes guilty of the lesser included offense of second degree murder and of felony murder. The district court merged the second degree murder conviction into the conviction for felony murder and sentenced Marentes to life in prison without the possibility of parole (LWOP).

## II. Discussion

¶ 11    Marentes contends that the judgment should be reversed because the district court erred by (1) denying his counsel's request for a mistrial; (2) admitting inadmissible hearsay and opinion testimony; and (3) allowing improper argument by the prosecutor. He also contends that, if none of these errors individually merit reversal, they do when considered cumulatively. In the alternative, Marentes contends that his LWOP sentence is unconstitutional. We don't see any error requiring reversal of his conviction and conclude that Marentes' sentence isn't unconstitutional.

### A. Motion for Mistrial

¶ 12    Marentes first contends that the district court should have granted a mistrial because a juror's conduct denigrated the defense and conveyed to other jurors the juror's opinion that Marentes was guilty. The juror's conduct, he says, violated his due process and

Sixth Amendment rights to an impartial jury. We conclude that the district court didn't abuse its discretion by denying the request for a mistrial.

### 1. Additional Background

¶ 13 At the end of the third day of trial, Juror 2 approached the district court's clerk to raise a concern. The clerk told the court that "[s]ome of the jurors are making comments while they're writing notes" in the jury room.

¶ 14 The next morning, the court's clerk and judicial assistant conveyed a second concern. Juror 9, a baker by trade, had told the judicial assistant that she had brought cookies for the jurors, cupcakes for court staff, a baguette for the judge, and brownies for the prosecution, but had said that "they're not for those people, meaning the Defense. She was very adamant about that." Juror 9 later told the clerk, Juror 1, and Juror 5 that "the brownies are for the [prosecutor], but not for [the defense]."

¶ 15 The court discharged Juror 9 based on the concern that she might be biased against Marentes. The court decided to question each juror separately to determine whether Juror 9's comments and

actions had impacted them. It questioned each of the jurors in camera (with prosecutors and defense counsel present).

¶ 16 Juror 1 said that she had heard Juror 9 say she had brought various baked goods. Juror 1 also said that the jurors hadn't been discussing the case in the jury room and there weren't any comments about who the baked goods weren't for. Juror 1 left the court's chambers for a moment but came back before the next juror and said, "I said one thing that was not true. . . . She did say who [the baked goods] were not for. I'm sorry." She confirmed that Juror 9 didn't intend to give baked goods to the defense. But Juror 1 also said that she could be unbiased and fair and "[t]hat [the] whole baked goods thing, that has absolutely nothing to do with it. I mean, this is important business."

¶ 17 Juror 2 asserted that it was Juror 9 who had been mumbling under her breath the previous day. She said she wasn't sure whether Juror 9 was mumbling about the case. But she said she was uncomfortable with "the things that [Juror 9 was] saying under their breath and the way they're presenting themselves when they go to the jury room." Juror 9 had apparently said something that

sounded like "a friend" when she got back to the jury room and some of Juror 9's "mannerisms" made Juror 2 uncomfortable.

¶ 18 Juror 3 said the day before he had heard an inappropriate comment by Juror 9 to the effect of "well, shit, if you know he did it." But Juror 3 hadn't heard anything about the baked goods.

¶ 19 Juror 5 said that Juror 9 had brought baked goods "for the People and the Judge, [judicial assistant], [clerk], and not for [the defense]." Juror 5 said she was "taken aback by the anger inside [Juror 9]" but that the incident didn't impact her "ability to judge and do what I feel is right."

¶ 20 Juror 6 said she hadn't heard any comments from any of the jurors, including Juror 9. But when defense counsel pressed her for more information, she said, "There was a moment yesterday where somebody muttered something under their breath that, like, gave me pause, but I do not remember -- like, truly, I do not remember who it was. I just remember having the thought of like maybe you shouldn't say that."

¶ 21 Juror 10 said he had heard the baked goods were for the prosecutors and the court but not the defense. He also heard

8

Juror 9 make comments like "why did he run." But he said he could remain fair and impartial.

¶ 22    Juror 11 said that he heard Juror 9 make comments like "no, no, no" during one of the witness's testimony. But he said he was annoyed by her comments and had tried to ignore them.

¶ 23    Jurors 4, 7, 12, and 13 said they hadn't heard any improper comments by other jurors or anything about baked goods.

¶ 24    After these interviews, Marentes' counsel moved for a mistrial, "given that a number of jurors heard the comments by [Juror 9,] and they weren't solely about baked goods but rather there were comments denigrating the [d]efense throughout the trial. And, additionally, she was attempting to communicate with witnesses testifying or had audible comments on witnesses testifying." Counsel added, "[T]he first juror was so concerned about these circumstances that she initially told us something that wasn't truthful and then came back and . . . admitted to that happening. That, to me, says the jurors are conscious that something not appropriate is happening."

¶ 25    The district court denied the motion for a mistrial. It found that "the jurors are incredibly fair [and] unbiased." And the court

concluded that the remaining jurors weren't "moved by [Juror 9's] comments, and I think, for the lack of a better word, offended by them in terms of their duties as jurors."

### 2. Applicable Law and Standard of Review

¶ 26 "The due process clauses of the United States and Colorado Constitutions guarantee every criminal defendant the right to a trial by an impartial jury." *People v. Dahl*, 160 P.3d 301, 304 (Colo. App. 2007) (quoting *People ex rel. Faulk v. Dist. Ct.*, 673 P.2d 998, 1000 (Colo. 1983)).

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."

*Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).

¶ 27 We won't second-guess a district court's ruling denying a request for a mistrial absent a showing of a gross abuse of discretion and prejudice to the defendant. *People v. Owens*, 2024 CO 10, ¶ 125. "A mistrial is the most drastic of remedies." *Id.*

10

(quoting *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986)). "[I]t is warranted only when the prejudice to the defendant is too substantial to be remedied by other means." *Id.*

### 3. Analysis

¶ 28    We conclude that the district court didn't abuse its discretion by denying Marentes' counsel's motion for a mistrial, for four related reasons.

¶ 29    First, there's no evidence that the remaining jurors deliberated before being instructed by the court to do so. Some jurors heard Juror 9 making statements under her breath, but the jurors who did were annoyed or confused about what she was saying. The remaining jurors relayed that Juror 9 had said, "a friend"; "no, no, no"; "well, shit, if you know he did it"; or "why did he run." Her comments may have bewildered the other jurors, but there's no indication in the record that the remarks led any of them to predeliberate. *Cf. People v. Clark*, 2015 COA 44, ¶¶ 230, 239-244 (remanding for an evidentiary hearing on consideration of extraneous information and possible juror predeliberation with an alternate juror); *People v. Kinney*, 148 P.3d 318, 324-25 (Colo. App. 2006) ("There is nothing whatever in the record to support

11

defendant's speculation that keeping the transcripts in the notebooks 'likely encouraged predeliberation.'"), *rev'd*, 187 P.3d 548 (Colo. 2008).

¶ 30     Second, there is no evidence in the record that any of the remaining jurors acted in a way suggesting bias against the defense.  The remaining jurors said things like "[t]hat whole baked goods thing, that has absolutely nothing to do with it [—] I mean, this is important business"; the events wouldn't affect the juror's "ability to judge and do what I feel is right"; and any comments Juror 9 made were inappropriate — meaning if she was denigrating the defense, the other jurors felt that she was being unfair.  *See People v. Manzanares*, 942 P.2d 1235, 1238-39 (Colo. App. 1996) (refusal to grant a mistrial wasn't an abuse of discretion where a discharged juror knew the defendant's father and told other jurors), *abrogated on other grounds by, Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011).

¶ 31     Third, there is no evidence in the record showing that the remaining jurors were somehow unable to disregard Juror 9's conduct.  The court questioned each juror, and none of them indicated that they were influenced by Juror 9's comments or

12

behavior, even when they understood what Juror 9 had said. Indeed, several of the jurors indicated that they had tried to ignore Juror 9. *See People v. Johnson*, 757 P.2d 1098, 1100 (Colo. App. 1988) ("[D]efendant has failed to show that the remaining jurors were unfair or biased, or that he was actually prejudiced by the dismissal and replacement of this particular juror.").

¶ 32    Finally, there is no evidence in the record indicating that the remaining jurors couldn't be fair and impartial. After dismissing Juror 9, the court found, based on the jurors' answers to questions, that each juror could be fair and impartial. This was so even as to Juror 1, who admitted that she hadn't been entirely truthful during her first conversation with the court and counsel. It was within the district court's discretion to credit the jurors' assurances of their ability to be fair and impartial. *People v. Christopher*, 896 P.2d 876, 878 (Colo. 1995) ("The trial court is in the best position to view the demeanor of a juror claiming impartiality, and the record must affirmatively demonstrate that the trial court abused its discretion before its decision can be disturbed on appeal.").

¶ 33    Nonetheless, Marentes contends that unrelated instances of audible crying in the courtroom emphasized the need to declare a

13

mistrial. While he concedes that these incidents didn't, by themselves, justify declaring a mistrial, he argues that they added to the prejudice caused by Juror 9's misconduct. But, as an analytical matter, we don't see what these incidents add to the assessment of whether a mistrial was required based on Juror 9's conduct. As Marentes concedes, these incidents weren't related to that conduct. Thus, they have relevance only if, separate from Juror 9's conduct, they required a mistrial — an argument Marentes expressly disavows.

¶ 34 In any event, we don't see any added unfair prejudice created by these incidents.

¶ 35 Sometime after the prosecution introduced a door-security-camera video in which yelling and gunshots can be heard, Marentes' counsel told the court during a bench conference that "there was some audible crying out in -- and weeping out in the courtroom by the victim's family." Counsel didn't ask the court to do anything other than to exercise caution in distributing to the jury another video that was about to be introduced. The court noted that the family members making the noise had left the courtroom by the time Marentes' counsel raised the concern.

¶ 36     During the prosecutor's closing argument, the victim's mother started crying. Marentes' counsel asked the court during a bench conference to order the victim's family members to leave the courtroom if they weren't "able to control their emotions." The court and both parties' counsel noted that the victim's mother had been crying but had already left the courtroom on her own volition by the time Marentes' counsel raised the issue. The court found that the jury had "a relatively short period of time" to hear the crying.

¶ 37     The emotional impact of the evidence, and, indeed, of the murder itself and the resulting trial, on the victim's family is to be expected in a case of this nature, and we doubt the jurors would be surprised or swayed by the limited showings of emotion in question. And, in this case, unlike the cases on which Marentes relies, no one in the audience organized a display in support of conviction. *See Norris v. Risley*, 918 F.2d 828, 830 (9th Cir. 1990); *Woods v. Dugger*, 923 F.2d 1454, 1457 (11th Cir. 1991). Given all that, we fail to see how the incidents "confirmed the need for a mistrial."

## B.    Detective's Testimony

¶ 38    Marentes next contends that the district court reversibly erred by allowing Detective Crider to testify that (1) he didn't think self-defense was applicable to this case and (2) M.Z.'s contradictory statements in her police interview didn't give him pause because M.Z.'s testimony incriminating Marentes was corroborated by other evidence.  We conclude that, even assuming that the district court erred by admitting the statements, the errors were harmless.

### 1.    Comment on Self-Defense

#### a.    Additional Background

¶ 39    Marentes' first contention is based on the following exchange:

> [Prosecutor:] And did any of the interviews that you conducted, did they lead you to believe this case was – had anything to do with self-defense?
>
> [Detective Crider:] No, sir.
>
> [Defense counsel:] Objection, calls for legal conclusion, move to strike.
>
> The Court: I think he's asking if there's any associated evidence to lead you to believe that there was – that there was a self-defense – that a person was acting in self-defense.
>
> [Prosecutor:] That's correct.
>
> The Court: Overruled.

16

b.     Standard of Review and Applicable Law

¶ 40    "Trial courts have broad discretion to determine the admissibility of evidence, and we review those rulings for an abuse of discretion." *People v. Ray*, 2025 CO 42M, ¶ 19 (citing *Davis v. People*, 2013 CO 57, ¶ 13).  A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law.  *Id.* (citing *People v. Montoya*, 2024 CO 20, ¶ 47).

¶ 41    We consider arguments pertaining to the admission of evidence that were preserved by timely objection under the harmless error standard.  *Id.* (citing *Montoya*, ¶ 47).[2]  We reverse for

---

[2] We decline Marentes' request to apply a constitutional harmless error standard of reversal.  He relies on *Andrew v. White*, 604 U.S. 86 (2025), for the proposition that the Due Process Clause protects against "unduly prejudicial evidence at a criminal trial."  But in that case, the Supreme Court explicitly didn't address whether the errors in question were harmless in light of the substantial evidence of guilt.  *Id.* at 89 n.1 ("The Court today says nothing about the strength of the evidence against Andrew because the issue of prejudice in both the guilt and sentencing phases of the trial is one for the Tenth Circuit to consider on remand.").  And the law is clear in Colorado that we apply the constitutional harmless error standard only if the error "specifically and directly offend[s] a defendant's constitutional rights."  *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010).  That standard doesn't apply to a garden-variety evidentiary error.  *See Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009).

nonconstitutional trial error "only if the error affects the substantial rights of the parties." *Hagos v. People*, 2012 CO 63, ¶ 12.

¶ 42 "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *People v. Baker*, 2021 CO 29, ¶ 31 (quoting CRE 704). "[I]n some circumstances, police officers may testify about the reasons they took certain investigative steps, even where this testimony touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶ 32. But "a witness cannot testify that he believes that the defendant committed the crime at issue." *Id.* at ¶ 31.

c.     Analysis

¶ 43 Even if we assume that the district court erred by admitting Detective Crider's response, any error was harmless.[3] Detective Crider's testimony was a two-word response to a single question on

---

[3] The People argue that Marentes' counsel "opened the door" by "direct attacks on the detective's honesty and professional competence, that his investigation was not looked at or even cared whether the defendant shot the victim in self-defense, and that the detective had assembled the evidence to conform with his pre-conceived, corrupt and irresponsible theory about the case." *See, e.g., People v. Cohen*, 2019 COA 38, ¶ 26. Because we conclude that any error was harmless, we won't address this argument.

18

the issue of self-defense. *See People v. Ornelas*, 937 P.2d 867, 872 (Colo. App. 1996) (a police detective's "fleeting" reference to evidence supporting a search warrant didn't undermine the fundamental fairness of the trial). Also, the evidence of Marentes' guilt is substantial. Witnesses testified that Marentes conspired with others to rob Del Valle, concealed himself in darkness after luring Del Valle with promises of sex, and shot Del Valle in the head as he drove away. Afterward at the party, Marentes and Junior bragged that they had killed Del Valle. And Marentes' attempt to evade apprehension and dispose of the murder weapon was clear evidence of a guilty mind. *See Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986) ("In light of the overwhelming evidence of guilt produced in this case, we conclude that the error in admitting this testimony was harmless.").

### 2. Comment on M.Z.'s Interview

#### a. Additional Background

¶ 44 The jury watched a video recording of an interview Detective Crider conducted with M.Z. During that interview, M.Z. made contradictory statements about who had planned to rob Del Valle and who had shot him. During Detective Crider's testimony, he

discussed M.Z.'s contradictions.  Later, the court asked him the following question from a juror without objection: "Given [M.Z.'s] numerous contradictory statements [re]: events and parties involved, did you have any concerns about her credibility as a key witness?"  He responded,

> Sure.  I mean, we saw her interview.  But, again, we're able to corroborate a lot of her interview with evidence that we have, with phone records that we have, with Snapchat that we have, and six other people at the party.  So we don't just rely on [M.Z.'s interview] at all.

Defense counsel objected on both hearsay and confrontation grounds.  The court overruled both objections.

### b.    Applicable Law and Standard of Review

¶ 45     Hearsay is inadmissible unless it falls within an exception or exclusion in a rule or statute.  CRE 802.  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  A statement is an oral or written assertion, or communicative nonverbal conduct.  CRE 801(a).  "The rule against hearsay encompasses not only verbatim out-of-court statements, but also implied hearsay or testimony that raises an

inference of out-of-court statements." *People v. Vigil*, 2024 COA 72, ¶ 28.

¶ 46 Because Marentes' counsel objected on hearsay grounds, we review any hearsay error for ordinary harmlessness. *Hagos*, ¶ 12.

¶ 47 "The Sixth Amendment of the United States Constitution affords to the accused the right 'to be confronted with the witnesses against him.'" *Marshall v. People*, 2013 CO 51, ¶ 15 (quoting U.S. Const. amend. VI). The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

¶ 48 We apply the constitutional harmless error standard to constitutional trial errors, including Confrontation Clause violations. *Raile v. People*, 148 P.3d 126, 133 (Colo. 2006) (citing *People v. Fry*, 92 P.3d 970 (Colo. 2004)).[4] Under this standard, the

---

[4] Marentes contends — and the People concede — that he preserved this issue for appeal. We note, however, that his trial counsel didn't object to the juror's question, which called for Detective Crider's opinion of M.Z.'s credibility as it related to the evidence discovered in his investigation.

People must show that the error was harmless beyond a reasonable doubt, meaning that the jury's verdict was surely unattributable to the error. *People v. Stone*, 2021 COA 104, ¶ 29. Admission of cumulative evidence that doesn't substantially influence the verdict or affect the fairness of proceedings is harmless beyond a reasonable doubt. *People v. Griffin*, 985 P.2d 15, 19 (Colo. App. 1998) (citing *People v. Fuller*, 788 P.2d 741 (Colo. 1990)).

### c.     Analysis

¶ 49     Without deciding whether the district court erred by allowing this testimony, we conclude that any error was harmless beyond a reasonable doubt. As noted, Detective Crider said that he was able to "corroborate a lot of [M.Z.'s] interview with evidence that we have, with phone records that we have, with Snapchat that we have, and six other people at the party." The jury had already seen the Snapchat clip, the phone records had also already been admitted into evidence, and several witnesses (both of the incident and the party) testified. Marentes therefore wasn't prejudiced by Detective Crider's repeating things the jury already knew or would come to know by the end of the presentation of evidence. *See Griffin*, 985 P.2d at 19.

22

¶ 50    We also agree with the People that because the detective referred to the witnesses "at the party," and Marentes' behavior at the party was uncontested, the detective's testimony was minimally prejudicial.

¶ 51    Lastly, as discussed, the evidence of Marentes' guilt was overwhelming.  *See Blecha v. People*, 962 P.2d 931, 944 (Colo. 1998) (independent evidence substantiating the defendant's conviction makes erroneously admitted evidence "'so unimportant and insignificant' that it is to be deemed harmless" (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967))); *People v. Caswell*, 2021 COA 111, ¶ 32 (error is harmless beyond a reasonable doubt where properly admitted evidence of guilt was "overwhelming"), *aff'd*, 2023 CO 50.[5]

¶ 52    Having concluded that any Confrontation Clause error was harmless beyond a reasonable doubt, it follows that any hearsay error was harmless.  *Hagos*, ¶ 12 ("Reversal is more difficult to

---

[5] Marentes relies on *Golob v. People*, 180 P.3d 1006 (Colo. 2008). But in that case, the court only decided whether the testimony at issue was admissible: It didn't decide whether the error in admitting the testimony required reversal.  *Id.* at 1011.  In this case, we decide only the latter question.

obtain under [the harmless error standard] than under the constitutional harmless error standard because this standard requires that the error impair the reliability of the judgment of conviction to a greater degree than the constitutional harmless error standard requires." (citing *Krutsinger v. People*, 219 P.3d 1054, 1058 (Colo. 2009)).

## C.   Prosecutorial Misconduct

¶ 53    Marentes also contends that the district court erred by allowing the prosecutor to argue that S.D.'s testimony was more credible because she received immunity from the prosecution.  We disagree.

### 1.   Additional Background

¶ 54    S.D. testified that she was at both the party and the scene of Del Valle's murder.  During that testimony, the prosecutor and Marentes' counsel asked her about the immunity she had received in exchange for her *truthful* testimony.  S.D. said immunity meant that nothing truthful that she said could be used against her.  She also acknowledged that if she were charged as an adult and convicted for Del Valle's murder, she could be sentenced to life in prison with the possibility of parole after forty years.

¶ 55    The prosecutor mentioned S.D.'s immunity during his rebuttal

closing argument:

> [Prosecutor:] You also heard that we provided
> use immunity for [S.D.].  What that means is
> that we cannot prosecute her for anything that
> she said on the stand except for perjury.  It
> also means she can't claim a Fifth Amendment
> right not to testify.  She was ordered to testify.
> If anything, that situation, immunity, should
> give more credibility to [S.D.], right?

Defense counsel objected that the prosecutor was vouching for

S.D.'s credibility.  The court overruled that objection.  The

prosecutor continued,

> When she's on the stand, the only thing she
> needs to worry about is perjury.  We can't
> prosecute her for anything she said.  That
> lends credibility to her testimony.

### 2.    Applicable Law and Standard of Review

¶ 56    "Prosecutors are generally given 'wide latitude to make

arguments based on facts in evidence and reasonable inferences

drawn from those facts.'"  *Ray*, ¶ 129 (quoting *People v. Strock*, 252

P.3d 1148, 1153 (Colo. App. 2010)).  But "while prosecutors 'can

use every legitimate means to bring about a just conviction,' they

have 'a duty to avoid using improper methods designed to obtain an

unjust result.'"  *Id.* (quoting *Domingo-Gomez v. People*, 125 P.3d

25

1043, 1048 (Colo. 2005)). "Comments calculated to mislead the jury or that suggest the prosecution has access to evidence the jurors don't are improper." *Id.* (citing *Domingo-Gomez*, 125 P.3d at 1048-49).

¶ 57     When we review a claim of prosecutorial misconduct, we first review the prosecutor's statements to determine whether they were improper based on the totality of the circumstances. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). If we determine that any of the statements were improper, we then apply the appropriate standard of reversal. *Id.* We review a preserved challenge to prosecutorial misconduct of nonconstitutional dimension for harmless error. *Id.* at 1097.

### 3.     Analysis

¶ 58     The evidence of a plea agreement was admissible, as was evidence of its terms, as it related to the consequences S.D. faced if she didn't testify truthfully. *People v. Racheli*, 878 P.2d 46, 48 (Colo. App. 1994) (Evidence of a plea agreement is admissible to allow "the finder of fact to consider all the pertinent factors surrounding such agreement in making its assessment of the witness' credibility."). Though witnesses in a criminal case

obviously face the prospect of perjury charges for testifying falsely, S.D. had added incentive to testify truthfully because, given her role and the plea agreement, she faced the prospect of imminent, even more serious charges relating to the murder itself if she testified untruthfully. Accordingly, the prosecutor could argue that the jury could use that evidence to determine S.D.'s credibility. *See Strock*, 252 P.3d at 1153. That is especially so because defense counsel tried to create the impression on cross-examination that the plea agreement *necessarily* shielded her from a potential murder charge.

¶ 59 Marentes asks us to adopt the Ninth Circuit's reasoning in *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980). In *Roberts*, the court concluded that a prosecutor couldn't argue that a witness was more believable because he had agreed to testify truthfully in exchange for a guilty plea on a reduced charge. *Id.* at 536. But several other courts, including a division of this court, have rejected the reasoning in *Roberts*. *See Racheli*, 878 P.2d at 48 (courts may admit "evidence of a plea agreement even if such agreement requires the witness to testify truthfully as a condition thereof"); *State v. Ish*, 208 P.3d 1281, 1287 (Wash. Ct. App. 2009) (the trial court didn't abuse its discretion by admitting evidence of a witness'

plea agreement requiring him to testify truthfully), *aff'd*, 241 P.3d 389 (Wash. 2010); *see also State v. Flores*, 281 A.3d 420, 445 (Conn. 2022) ("[A]lthough it would have been better if this particular reference to truthfulness had been omitted — and although we believe that, in the future, the state should avoid such language — we stop short of concluding that the trial court abused its discretion in admitting that portion of the cooperation agreement.").  In any event, even the Ninth Circuit has limited *Roberts*' application, holding that "references to requirements of truthfulness in plea bargains do not constitute vouching when the references are responses to attacks on the witness' credibility because of his plea bargain."  *United States v. Shaw*, 829 F.2d 714, 716 (9th Cir. 1987) (citing cases).  And, as noted above, that is what defense counsel did on cross-examination.

¶ 60      In *People v. Sellers*, 2022 COA 102 (*Sellers I*), *aff'd on other grounds*, 2024 CO 64 (*Sellers II*), the division held that

> [t]he specifics of a plea agreement between the prosecution and a witness — including the requirement that the witness provide "truthful testimony" — is admissible, at least where the prosecutor does not express an opinion that the witness actually told the truth and there is

> no suggestion that the prosecutor possesses information unavailable to the jury.

*Id.* at ¶ 30. Therefore, the court further held, the prosecutor didn't commit misconduct by telling the jury in opening statement about a plea deal the prosecution entered into with a witness to get the witness to "testify truthfully." *Id.* at ¶¶ 29-31.

¶ 61 In this case, too, the prosecutor didn't express a personal opinion that S.D. had testified truthfully or indicate that she had information not before the jury, but instead argued that the obligation to testify truthfully supported her credibility. Thus, the prosecutor didn't commit misconduct.

### D. Cumulative Error

¶ 62 We reject Marentes' cumulative error argument. Considering the two errors we have assumed for purposes of argument (allowing the detective's statements), we don't perceive that Marentes was denied his right to a fair trial. *Howard-Walker v. People*, 2019 CO 69, ¶ 24.

### E. LWOP Sentence

¶ 63 Marentes contends that the district court erred by sentencing him to LWOP for felony murder because that sentence is

categorically unconstitutional or, in the alternative, is grossly disproportionate to his offense in violation of the Eighth Amendment to the United States Constitution and article II, section 20 of the Colorado Constitution.  We reject both contentions.

### 1.  Standard of Review and Applicable Law

¶ 64    "We review de novo the constitutionality of statutes."  *Sellers II*, ¶ 16.  We also review de novo whether a sentence is grossly disproportionate to the offense in violation of the Eighth Amendment and article II, section 20 of the Colorado Constitution. *Wells-Yates v. People*, 2019 CO 90M, ¶ 35.

¶ 65    The Eighth Amendment and article II, section 20 provide that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII; Colo. Const. art. II, § 20.  "This prohibition 'guarantees individuals the right not to be subjected to excessive sanctions.'" *Sellers II*, ¶ 17 (quoting *Miller v. Alabama*, 567 U.S. 460, 469 (2012)).  "This right stems from the concept that punishment for a crime should be proportionate to both the offender and the offense." *Id.*

## 2. Categorical Unconstitutionality

¶ 66     Marentes argues that LWOP sentences for felony murder are categorically unconstitutional. But, as Marentes acknowledges, we are bound by the supreme court's decision in *Sellers II*, in which the court held that such a sentence isn't categorically unconstitutional.

## 3. Disproportionality

¶ 67     Marentes also contends that his sentence is grossly disproportionate. We disagree.

¶ 68     The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Wells-Yates*, ¶ 5 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment)); *accord Rutter v. People*, 2015 CO 71, ¶ 15. "[I]n conducting proportionality reviews in non-capital cases, courts will rarely conclude that a defendant's sentence is grossly disproportionate." *Rutter*, ¶ 16. Because fixing prison sentences for crimes is uniquely within the General Assembly's province, courts "grant 'substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted

criminals.'" *Sellers II*, ¶ 41 (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983)).

¶ 69     To determine whether a sentence is constitutionally proportionate to the crime, we apply a two-step process. *Id.* at ¶ 44. The first step is an abbreviated proportionality review: We consider "(a) the gravity or seriousness of the offense along with (b) the harshness of the penalty." *Id.* "When a crime is per se grave or serious, a sentencing court may skip the determination regarding the gravity or seriousness of the offense and proceed directly to assess the harshness of the penalty." *Id.* at ¶ 48.

¶ 70     If the abbreviated proportionality review gives rise to an inference of gross disproportionality, we go to step two — the extended proportionality review. *Id.* at ¶ 45. In step two, "the court may compare the defendant's sentence to sentences for other crimes in the same jurisdiction and to sentences for the same crime committed in other jurisdictions." *Id.* at ¶ 44.

¶ 71     Applying step one, we agree with the division's reasoning in *Sellers I*: "Felony murder is a per se grave or serious offense because it necessarily involves committing a violent predicate felony that results in the death of a person. Thus, every factual scenario

giving rise to a charge of felony murder will be grave or serious."
*Sellers I*, ¶ 65. And robbery, the predicate crime for Marentes'
felony murder conviction, is also a per se grave or serious crime.
*Wells-Yates*, ¶ 64 ("A conviction for robbery is per se grave or
serious because it will always involve knowing conduct and grave
harm (or the threat of grave harm) to the victim or society (or
both)."); *accord People v. Kennedy*, 2025 CO 63, ¶ 19. It would be
an odd result indeed to conclude that robbery loses this status
when it leads to the death of another person.[6]

¶ 72     Turning to the harshness of the penalty, the facts in this case
are at least as grave or serious as those in *Sellers I* — in which the
defendant was convicted of conspiracy to murder the victim — and
*Harmelin* — in which the defendant received a LWOP sentence for
possessing 672 grams of cocaine. *See Sellers I*, ¶¶ 5-6; *Harmelin*,
501 U.S. at 988. Marentes conspired with others to rob Del Valle.
Marentes and Junior hid in the shadows with their guns loaded
while M.Z. lured Del Valle from his car and into the street. And as

---

[6] The court instructed the jury that robbery or attempted robbery
was an element of the felony murder charge that the prosecution
was required to prove beyond a reasonable doubt. And the court
instructed the jury on the elements of robbery.

soon as he got out of his car, Marentes ambushed him, shouted that he was robbing him, raised his gun (with a bullet in the chamber), and subsequently fired the shot that killed Del Valle. Put simply, Marentes wasn't a getaway driver; he was the trigger man.[7]

¶ 73 We recognize that LWOP is the most severe sentence authorized by the General Assembly. "Nonetheless, the Supreme Court has concluded that sentencing certain defendants who have committed felonies to LWOP does not necessarily run afoul of the Eighth Amendment." *Sellers II*, ¶ 52 (citing *Harmelin*, 501 U.S. at 994-96). Thus, we conclude that Marentes' sentence doesn't give rise to an inference of gross disproportionality, and therefore an extended proportionality review isn't warranted. *See id.* at ¶ 53.

### III. Disposition

¶ 74 We affirm the district court's judgment and sentence.

JUDGE GROVE concurs.

JUDGE SCHUTZ specially concurs.

---

[7] These facts also support the conclusion that Marentes' offense was, in fact, grave or serious. *See Sellers v. People*, 2024 CO 64, ¶¶ 49-50.

JUDGE SCHUTZ, specially concurring.

¶ 75     I agree with the result reached in the majority opinion and nearly all of the majority's reasoning.  I write separately, however, because I believe the majority opinion unnecessarily concludes that felony murder is per se grave or serious.

¶ 76     As the majority correctly notes, in *People v. Sellers*, 2022 COA 102 (*Sellers I*), *aff'd on other grounds*, 2024 CO 64 (*Sellers II*), a division of this court held that "[f]elony murder is a per se grave or serious offense because it necessarily involves committing a violent predicate felony that results in the death of a person.  Thus, every factual scenario giving rise to a charge of felony murder will be grave or serious." *Sellers I*, ¶ 65.

¶ 77     But the conclusion in *Sellers I* was not endorsed on appeal.  Rather, the supreme court stated as follows:

> [W]e begin by noting that we have never determined whether felony murder is a per se grave or serious offense.  Unlike the division below, . . . we perceive no need to decide whether it is because even assuming without deciding that it is not per se grave or serious, the application of the above-described factors to this case establish that Sellers's offense was, in fact, grave and serious.

*Sellers II*, ¶ 49.

¶ 78    I would heed the supreme court's judicial restraint in this case as well.  In my estimation, there is no need to decide whether felony murder is per se grave or serious because, as the majority correctly reasons, the specific facts of this case make clear that the felony murder Marentes committed was grave or serious.

¶ 79    As the supreme court recently reminded us,

> [d]espite [the] benefits of efficiency and consistency, we have encouraged caution before labeling a crime as per se grave or serious.  *Wells-Yates* [*v. People*, 2019 CO 90M], ¶¶ 61-62.  We have done so because the label eliminates a longstanding layer of due process for criminal defendants.  Hence, we have observed that the per se designation should rarely be used.  *Id.* at ¶ 63.

*People v. Kennedy*, 2025 CO 63, ¶ 17.  Because we have an alternative option in this case, I would avoid any suggestion that, "based on the elements of the offense, there's 'no set of circumstances' where the conduct *and* culpability of a convicted individual aren't grave and serious."  *Id.* at ¶ 18 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

¶ 80    Such caution is particularly appropriate in the felony murder context given recent legislation that changed felony murder from murder in the first degree to murder in the second degree, *see* Ch.

36

58, secs. 1, 2, §§ 18-3-102, -103, 2021 Colo. Sess. Laws 235-36, and established an affirmative defense for someone charged with felony murder who was not as culpable as others who were involved in the underlying felony:

> It is an affirmative defense to [felony murder] that the defendant:
>
> (a) Was not the only participant in the underlying crime; and
>
> (b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
>
> (c) Was not armed with a deadly weapon; and
>
> (d) Did not engage himself or herself in or intend to engage in and had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious bodily injury.

§ 18-3-103(1.5), C.R.S. 2025. This legislation, which became effective after Marentes's crime, reflects a continuing evolution in Colorado's assessment of the severity of felony murder, and it establishes an affirmative defense for some participants in an underlying felony murder by which they could now be found not

guilty.[1]  *See Wells-Yates*, ¶¶ 54-73 (reviewing recent legislation and concluding that not all drug offenses, generally, and narcotics possession, specifically, are per se grave or serious).

¶ 81    Finally, I am persuaded that judicial restraint is particularly important in creating new classes of "per se grave or serious" crimes given the supreme court's ongoing reflection and disagreement on whether this unique Colorado doctrine should be completely jettisoned.  *Compare Kennedy*, ¶ 23 (concluding that vehicular homicide is not per se grave or serious), *with id.* at ¶ 48 (Boatright, J., concurring in part and concurring in the judgment) ("[V]ehicular homicide — DUI should be deemed per se grave or serious . . . ."), *and id.* at ¶ 49 (Samour, J., specially concurring) ("[T]here are compelling reasons for our court to rid our jurisprudence of the 'per se grave or serious' designation in proportionality reviews of sentences.").

---

[1] The recently enacted affirmative defense would not apply to Marentes's crime because the crime was committed before the statute was enacted and, in any event, his actions did not meet the enumerated criteria for the affirmative defense.  But that is the point: The per se grave or serious designation captures any conviction for the labeled offense regardless of the specific actions of differently situated parties convicted under that offense.

¶ 82    Because I think judicial restraint in addressing whether felony murder is per se grave or serious is particularly warranted in this case, I would not address that issue in any manner.

Accordingly, I concur in the judgment.